595 So.2d 1164 (1991)
FIRMIN, INC.
v.
DENHAM SPRINGS FLOOR COVERING, INC., et al.
No. 90 CA 1981.
Court of Appeal of Louisiana, First Circuit.
December 27, 1991.
Rehearing Denied March 13, 1992.
*1165 W. Luther Wilson, Baton Rouge, for Armstrong World, et al.
Ernest Forbes, Denham Springs, for Firmin, Inc.
J. Donald Morgan, Baton Rouge, for Denham Springs Floor Covering, Inc.
Before SHORTESS, LANIER and CRAIN, JJ.
SHORTESS, Judge.
Firmin, Inc. (Firmin), was the general contractor for the construction of Live Oak Middle School for the Livingston Parish School Board pursuant to a written contract signed by these parties on May 24, 1983. Alvin Fairburn and Associates, Inc. (Fairburn), was the design architect. Firmin subcontracted the floor covering work to Denham Springs Floor Covering, Inc. (DSFC).
Construction of the school began around June 3, 1983. The concrete slab was poured in stages beginning in August 1983. DSFC began the installation of the tile flooring over a several-week period beginning around June 1, 1984. Charles Foster of DSFC bought the tile and adhesive which were manufactured by Armstrong World Industries, Inc. (Armstrong), from The Patterson Company, Inc. (Patterson). DSFC subcontracted the labor for installation to John O'Neal.
Shortly after school started in August 1984, school officials noticed that black liquid appeared to be oozing up or "bleeding" *1166 between the joints of the tile and onto the floors throughout the school building.
The School Board made demand upon Firmin to replace the floor, which it did. Firmin then filed suit on January 20, 1986, against DSFC and Charles Foster to recover its costs of $56,769.11, and the cost of borrowing from its bank the money to do the work, amounting to $18,760.49.
On February 24, 1986, DSFC answered the suit and filed a third party demand against Fairburn, Armstrong, and Patterson.[1] Fairburn was subsequently dismissed on an exception raising the objection of vagueness. On December 11, 1986, Firmin amended its petition to name Armstrong as an additional defendant on the main demand.
The case was tried beginning on November 29, 1989. Upon completion, the trial court rendered written reasons for judgment wherein it awarded plaintiff the principal sum of $75,529.60 against DSFC[2] and Armstrong in solido. It further awarded DSFC judgment on its third party demand against Armstrong.
In its reasons for judgment, the trial court made the following dispositive findings of fact:
Second, the [record] adduced at trial establishes by a preponderance of the evidence that the adhesive used on the flooring failed because it was faulty due to the effects of the plasticizer, which is a synthetic material used in the manufacture of vinyl block tile. It was established at trial that even though the plasticizer is not a component of the adhesive in question, after the tile is laid over the adhesive, the plasticizer migrates into it and can cause it to emulsify and ultimately bleed through the joints between the tile blocks. This explanation of the cause of the problem encountered with the tile flooring at the newly-built school was presented through the testimony of various witnesses including Robert W. Lukowski, a chemist employed by Armstrong, and Clare R. Bleacher, an employee of Armstrong with thirty-one years['] experience in Armstrong adhesives.
The trial court found DSFC performed the installation in a workmanlike manner. However, the court found DSFC breached the contract because it used faulty material in the work.
Armstrong alleged prescription as an affirmative defense in its answer to Firmin's supplemental and amending petition.[3] The trial court found no merit in this defense, finding that the ten-year prescription for quasi-contracts, rather than the one-year tort prescription, was applicable to these facts, citing Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967), as its authority.
Armstrong and Patterson have appealed suspensively to this court urging three specifications of error.[4]

I. FACTUAL FINDINGS
In its first specification, Armstrong asserts error in the factual conclusions made by the trial court.
It is uncontested that in August 1984 after school started and the floors in question were subjected to constant traffic from students, teachers, and staff, extensive bleeding became obvious and a problem throughout the entire school. The question is: Why did it happen? Plaintiff has a theory, as do defendants, and the resolution of this question disposes of the case.
*1167 Plaintiff's theory is that the materials furnished its subcontractor by Patterson and manufactured by Armstrong were defective. To support this theory, many witnesses were called. We will outline pertinent testimony from the key witnesses.
Ronald Madden, a civil engineer with expertise in substance measurements, found that DSFC used twice as much adhesive (glue) as recommended by Armstrong (350 to 400 square feet per gallon). Madden's tests showed that in the areas with the most severe bleeding, the spread rate (thickness of the glue) was 165.7 square feet per gallon. The spread rate in bleeding areas was 2.11 to 2.72 times more adhesive than recommended by Armstrong. The spread rate was 280 square feet per gallon in the non-bleeding areas. Madden found no excessive moisture or water in the slab and did not remember seeing any alkali salt on the floor. He was of the opinion that too much adhesive could cause bleeding.
Charles Foster, a defendant and general manager of DSFC, testified that DSFC had subcontracted for the tile floors in the school; that the job began the first part of June 1984 and took about three to four weeks to complete; that the labor to do the flooring was subcontracted to John O'Neal; that Armstrong Axilon Tiling block vinyl flooring was used; that the flooring was purchased from Patterson; that Armstrong S-89 adhesive was used, also purchased from Patterson; that a concrete floor has to be properly prepared after curing to receive tile; that a sander is run over the concrete floor to make sure all mud, paint, etc., is taken off, the floor is swept, then glue is spread onto the floor with a metal trowel (a hands and knees job); that the spread rate is 350 to 450 square feet per gallon; that since concrete is porous, it takes a little more adhesive than a perfectly smooth, less porous surface would take; that if more than the recommended amount of adhesive is applied, it should not result in bleeding if it is allowed to dry; that there is a time period between laying adhesive and putting on the tile, which is called open time; that in our climate open time varies between 30 minutes to overnight; that he had never in all his years in floor covering work had a bleeding problem like this one; that the adhesive on the back of many of the tiles had a glossy finish when he took them up, while tile taken up after drying always had a dull-looking finish; that the samples introduced into evidence still are not dry, even after five years; that some alkali crystals were found at the joints, which had to come from moisture; and that if moisture is the problem, tiles will not stick because excessive moisture breaks down the glue.
Kenneth Altazan was selected to redo the floors after his name came up through the Baton Rouge Floor Covering Association. He had 18 years' experience in this type work and had been to numerous Armstrong schools. He testified that he replaced 41,000 square feet of tile flooring; that when moisture is a problem the tiles present a peaking or cupping effect which was not present; that much of the adhesive was sticky when the tiles were taken up; that it appeared the adhesive had been applied correctly, yet he could see puddles of adhesive in some of the tiles (this he said was not in terms of thickening but a "failure of sorts"); that since he was afraid if he applied the incorrect adhesive to the sticky remaining adhesive the additional buildup might break the new adhesive down, he used High Bond 935, a latex multi-purpose adhesive (which has stood the test of time and not broken down); that the original application of glue showed a migrating pattern as if the adhesive in the center of the tile was going to the edges and coming out; that it was runny, breaking down, and puddling; that he never determined why the adhesive bled, but through trial and error redid the job properly; and that too much glue would have been apparent within an hour after application.
H.P. Firmin, Jr., who has 30 years' contracting experience and owns Firmin, Inc., the general contractor, testified that his company complied with all contract plans and specifications relative to the construction of the concrete slab; that when the bleeding problem was brought to his attention *1168 he got Ron Madden to take a case sample to send to Portland Cement for testing; that when the Portland test showed no moisture problem, he asked Charles Foster of DSFC to correct the problem; that when Foster did not, he corrected it at his own expense; that he got Altazan to do it; that he paid Altazan $54,906.53; and that he also had expenses of $1,802.58 interest on a loan from Bank of the South of $18,760.49.
Albert Green, another expert in floor covering installation with about 32 years' experience, looked at the job at Charles Foster's request shortly after the problem occurred. Green testified that the color of the adhesive shows if there is an alkali or moisture problem, as the adhesive will be tan; that this is what he expected when he got to the school; that the color indicated to him it was not moisture or alkali; that the tile was perfectly laid, which ruled out application when the glue was too wet; that the tile had to be broken to get it up, which showed the problem was not alkali or moisture; that the adhesive should have looked dull, not shiny, and should not have been sticky; that if the glue was good it would not still be sticky to the touch; and that when he left the school site he was convinced the glue was bad.
Victor J. Blanchard, a chemist and general manager of West Payne Lab, Inc., was retained by DSFC to look at the problem in May 1985. He testified that after consulting with Armstrong he did a relative humidity test; that the test required a three-day period with readings taken daily from a meter which is sealed to the floor; that the humidity measured 65% when the test began and never went above 68%; that the tests were made a year after the problem; and that he also read Armstrong literature which said a slab is cured sufficiently for application of its adhesive when the humidity of the slab is 80%.
Clare Bleacher, senior installation specialist for Armstrong with 31 years' experience, went to the site in June 1985 with Foster and O'Neal. He testified that he found brownish adhesive, which indicated moisture, and shiny black tile, which is caused by excessive adhesive or inadequate setup time; that Madden's tests were consistent with what he found (twice as much adhesive was applied as should have been); that he felt moisture caused problems in some places and too much adhesive caused problems in other places; and that it would take about a year for a plasticizer problem to manifest because it is a slow process and takes time to migrate out.
Robert Lukowski, senior project chemist for Armstrong with 25 years' experience, including investigations of similar complaints, testified extensively on cross-examination during plaintiff's case in chief and on direct and cross-examination during Armstrong's case. He testified that there were three main causal possibilities: (1) alkaline moisture, (2) plasticizer, and (3) too much adhesive; that there were other causes and combinations of causes that could cause the problem, but he was mainly concerned with the three mentioned above; that the adhesive does not contain a plasticizer; that the plasticizer is a component of tile[5] which makes the tile flexible; that a phenomenon occurs when tile is put on adhesive because the plasticizer migrates out of the tile and into the adhesive, causing the adhesive to fluidize; that while this phenomenon was well known to Armstrong, it was not publicized; that he did not believe a plasticizer caused the problem; that plasticizer does not make adhesive sticky but makes it more fluid; that his examination of a sample of the tile and adhesive, done on November 20, 1989, showed (1) a small amount of plasticizer (under 5%), (2) all naphtha[6] had evaporated, and (3) the adhesive met Armstrong's specifications; that he would think that if there had been anything wrong with the adhesive an experienced installer like O'Neal would have noticed it; that an excessive application of asphalt will skin over and trap the naphtha inside; that tile layers *1169 will then have raw adhesive underneath the skinned-over coat; that the excess adhesive will flow out and come through joints later when people put pressure on the tile walking over it; that it takes considerable time for the migration phenomenon to occur, much longer than involved in this case; that migration never occurs in cases when the plasticizer is found in quantities less than 5%; and that he never visited the site.
This is a credibility call if ever there was one. In our appellate review, we must apply the test recently restated by the Louisiana Supreme Court in Rosell v. ESCO, 549 So.2d 840 (La.1989):
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the [fact finder's] choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.

549 So.2d at 844. (Citations and footnote omitted.)
Altazan probably knew more about the floor than anyone else. He removed the old floor and replaced it. He candidly admitted that after he was finished he still did not know what caused the floor to "bubble." His visual observations, however, were very significant. He said the adhesive appeared to have been applied correctly, yet he could see on some tile a "puddling" of adhesive. He explicitly explained this observation by saying he was not talking about thickness but of a "failure of sorts." His observations were verified by this court which examined the tiles placed in evidence (A-1, A-2, A-3, A-10, and the bag of tile, P-5). Our untrained eyes noted what appeared to be a non-uniform migration of substances rather than a particular thickness in many of the tiles.
An appellate court is not afforded the discretion to retry a case like this and make its factual findings. That is not our role. We take the record and simply review it. If it meets the Rosell standard, we must find no "manifest error."
We note that many of the witnesses gave testimony that seemed to favor the other side. Madden, for example, a witness for plaintiff, found from his testing that too much adhesive was used. Altazan said that while too much glue was a main cause of bleeding, it would be almost immediately discovered and easily corrected. Some witnesses saw salt on the floors and others did not.
Foster testified that if more than the recommended adhesive is applied, it should not result in bleeding if it is allowed to dry. Lukowski said, however, that excessive application will cause the outer liquid to skin over and trap naphtha inside. After the floor is laid and pressure is applied, the raw adhesive underneath erupts through the outer skin and then bleeds through the tile cracks.
There was a contradiction between the witnesses as to why most of the tile in evidence had a glossy finish. Smith said it resulted from bad glue. Bleacher said it was caused by excessive glue or inadequate setup time. Green and Altazan both testified the installation was a perfect one. Foster testified that all the tile he had ever taken up had a dull-looking finish. Altazan also testified that if too much glue had *1170 been applied, the bleeding would have taken place within an hour after the tiles were laid. Also, the adhesive on all the tiles in evidence was black. None was tan or brown.
Finally, plaintiff's witness Albert Green, who had been in the floor covering business for 32 years, felt after his inspection that the glue was bad. At that time, notwithstanding his experience, he did not know about the plasticizer problem because as Lukowski testified, Armstrong does not publicize it. The trial court found the flooring was faulty because of a plasticizer in the tile which migrated into the adhesive, causing it to run. Since the plasticizer was within the peculiar knowledge of Armstrong and a trade secret at the time, none of the uninformed at the job site were aware of the phenomenon. This phenomenon, created by the migration of the plasticizer into the adhesive, certainly results in the breakdown of the glue. Under the totality of evidence, applying the Rosell standard, it is impossible for us to say that the trial court was clearly wrong in finding the plasticizer to be the cause.

II. PRESCRIPTION

A. The Main Demand
Armstrong argues that the trial court erred in finding no merit in its affirmative defense of prescription. The tile was installed beginning in June 1984. The bleeding was known by all parties in October 1984. Plaintiff sued DSFC on January 20, 1986. DSFC brought a third party demand against Armstrong in February 1986. Plaintiff added Armstrong as a defendant in 1986. No suit was filed against anyone until after a year elapsed from the date all parties had knowledge of the defect.
Firmin's cause of action against DSFC is one for breach of a construction contract (lease of labor for work by the job). See O & M Construction v. State, 576 So.2d 1030, 1039 (La.App. 1st Cir.), writ denied, 581 So.2d 691 (La.1991). As such, it is subject to the liberative prescription of ten years provided for in Louisiana Civil Code article 3500. Thus, Firmin's suit against DSFC was timely when filed on January 20, 1986.
Armstrong argued that Firmin's suit against it was one in redhibition which prescribed in October 1985. The trial court found Firmin's cause of action against Armstrong was not in redhibition because there was no buyer-seller relationship between Firmin and Armstrong. Relying on Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967), the court found Firmin's suit against Armstrong was one based on a theory of unjust enrichment and thus the ten-year prescriptive period applied. However, Minyard clearly is inapplicable to this case for two reasons.
First, privity of contract has not necessarily been a requirement for a redhibition action in this state since 1972. See Media Productions v. Mercedes Benz, 262 La. 80, 262 So.2d 377 (1972). Second, Minyard involves an equitable remedy (the actio de in rem verso or action for unjust enrichment).[7] Pursuant to our statutory law and jurisprudence, we can apply equitable principles to decide cases only in the absence of express law. Louisiana Civil Code article 4; Edmonston v. A-Second Mortgage Co., 289 So.2d 116 (La.1974); Terrebonne Parish Police Jury v. Kelly, 428 So.2d 1092 (La.App. 1st Cir.1983). Express law is applicable to this case via Louisiana Civil Code articles 2315, 2317, 2545, 2546, 3492, and 3493. See for example, Mouton v. State, 525 So.2d 1136 (La.App. 1st Cir.), writ denied, 526 So.2d 1112 (La.1988).
Firmin's cause of action against Armstrong is one in products liability. A products liability cause of action in which the plaintiff is a consumer of the product may sound in tort, Louisiana Civil Code article 2315, in redhibition, Louisiana Civil *1171 Code article 2545, or both. The prescriptive period for a tort products liability action is one year from the date of injury. Louisiana Civil Code articles 3492 and 3493. The prescriptive period for a redhibition products liability action against the manufacturer is one year from the date of discovery of the vice. Louisiana Code of Civil Procedure article 2546. In this case, the damage was apparent in August 1984. The parties knew of the vice no later than October 1984. Firmin's claim against Armstrong prescribed in October 1985. The amended petition filed December 11, 1986, adding Armstrong as a defendant in the main demand, was not timely.
The trial court found that Armstrong and DSFC were solidary obligors. Suit against one solidary obligor interrupts prescription against all solidary obligors. Louisiana Civil Code article 1799. However, suit against DSFC in January 1986 could not interrupt prescription against Armstrong because prescription had already run as to Armstrong. Once prescription occurs it cannot be interrupted. Timely suit against one solidary obligor does not interrupt prescription that has run against another solidary obligor. Noggarath v. Fisher, 557 So.2d 1036, 1037 (La.App. 4th Cir.1990).
The trial court committed legal error in ruling against Armstrong on its affirmative defense of prescription and rendering judgment on the main demand in favor of Firmin against Armstrong. We thus reverse the judgment on the main demand against Armstrong and render judgment dismissing Firmin's claim against Armstrong.

B. Third Party Demand
DSFC has the same type of cause of action against Armstrong as did Firmin. Thus, DSFC's third party demand against Armstrong filed on February 24, 1986, was vulnerable to an objection of prescription. Armstrong did not raise prescription in its answer to DSFC's third party demand or by filing an exception. The objection of prescription must be specially pleaded; a court cannot supply it. Louisiana Code of Civil Procedure article 927. Further, Louisiana Code of Civil Procedure article 1111 provides the third party defendant must plead his objections and defenses in the manner prescribed in Louisiana Code of Civil Procedure articles 921 through 969, 1003 through 1006, and 1035. The trial court was not clearly wrong factually in rendering judgment in favor of DSFC on its third party demand against Armstrong. That judgment is affirmed.

III. INTEREST
Armstrong says that the trial court erred in awarding interest on interest. Part of the judgment awarded to plaintiff included $18,760.49, which was the cost plaintiff incurred to borrow the $56,769.11 from the Bank of the South. Plaintiff is entitled to be reimbursed for the full amount of its loss including the interest it paid to the bank. Louisiana Civil Code article 2001 does not apply to interest which is paid for the "use of money." Unity Plan Finance Co. v. Green, 179 La. 1070, 155 So. 900 (1934).
For all these reasons, the judgment on the main demand is reversed as to Armstrong. The judgment on the third party demand in favor of Denham Springs Floor Covering and against Armstrong is affirmed. Costs of this appeal are taxed to Armstrong.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
Before SHORTESS, LANIER and CRAIN, JJ.

ON APPLICATION FOR REHEARING
PER CURIAM.
Armstrong World Industries (Armstrong) and Patterson Company, Inc., have applied for rehearing of this court's decision affirming the trial court's judgment in favor of Denham Springs Floor Covering and against Armstrong on the third party demand. As noted in our original opinion, Patterson Company, Inc., was not named in the judgment, and its appeal is not properly before this court.
*1172 Armstrong contends this court erred in failing to dismiss the third party demand based on prescription. In its application for rehearing, Armstrong acknowledges that no specific plea, either by affirmative defense or exception, was raised before this court's decision. It contends, however, we should have considered this issue because "[a]ll parties have always accepted the prescription issue as being properly before the court" and the "issue has been addressed by all parties in brief."
Armstrong cites Guitreau v. Juneau, 479 So.2d 431 (La.App. 1st Cir.1985), for the proposition that this court can consider a peremptory exception raised only in brief and not by formal pleading. Guitreau, however, involved an exception raising the objection of no cause of action, which may be noticed by the appellate court on its own motion. This is in marked contrast to an exception raising the objection of prescription, which cannot be supplied by the court. La.C.C.P. art. 927.
The rule that the issue of prescription cannot be considered if raised only in brief on appeal has acquired the status of jurisprudence constante, having been followed by Louisiana courts since at least 1854. See Stark v. Burke, Watt & Co., 9 La.Ann. 341, 343-344 (1854); Daniel v. Harrison, 23 La.Ann. 473 (1871); Pelican Well Tool & Supply Co. v. Dickson, 12 La.App. 545, 126 So. 543 (1930); Smith v. Jones, 8 So.2d 718 (La.App. 1st Cir.1942); State v. Champagne, 371 So.2d 626 (La.App. 1st Cir. 1979); Eschete v. Gulf South Beverages, 442 So.2d 556, 562 (La.App. 1st Cir.1983); Bergeron v. Houma Hospital Corporation, 514 So.2d 1192, 1194-1195 (La.App. 1st Cir.1987), writ denied, 517 So.2d 812 (La.1988).
Armstrong filed a formal peremptory exception raising the objection of prescription on December 30, 1991, one minute before filing its application for rehearing. Code of Civil Procedure article 2163 provides in pertinent part:
The appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of the case for a decision, and if proof of the ground of the exception appears of record.
(Emphasis added.) Armstrong contends the application for rehearing is "submission of the case for a decision."
This argument, however, was rejected by the Louisiana Supreme Court in Stark v. Burke, Watt & Co., 9 La.Ann. 344 (1854).[1] The defendant in Stark attempted to file an exception raising the objection of prescription while its application for rehearing was pending. The court stated:
The time of a court of justice should not be occupied with determining a cause on the general merits, only to reach the fruitless result of setting aside its decree, not because it is erroneous in the case presented, but because the litigant desires to present a new question which he might have presented before....
It is proper to add, that the provisions of our Code on the subject of rehearing, were clearly framed for the purpose of affording the court an opportunity of correcting an erroneous judgment, not for the purpose of raising new issues under new pleas.
See also O'Hara v. City of New Orleans, 30 La.Ann. 152 (1878); and Smith v. Jones, 8 So.2d 718 (La.App. 1st Cir.1942).
According to the formal minutes of this court, this case was submitted for decision without oral argument on October 31, 1991. We thus have no alternative but to ignore the plea as having been filed too late. See Merchants Adjustment Bureau v. Malta, 102 So.2d 781, 785 (La.App. 2d Cir.1958). For the foregoing reasons, the application for rehearing is denied.
*1173 APPLICATION FOR REHEARING DENIED.
NOTES
[1] DSFC also sued Barry L. Moore & Associates, Inc., which provided mechanical engineering services for construction of the school. Moore was subsequently voluntarily dismissed by DSFC.
[2] At the completion of plaintiff's case, Charles Foster individually moved for an involuntary dismissal which plaintiff did not oppose and the trial court granted.
[3] The parties and the trial judge continually refer to an "exception of prescription" throughout the record. No exception is found in the record. The Louisiana Code of Civil Procedure does not require that an exception raising the objection of prescription be filed; it may properly be raised as an affirmative defense.
[4] Patterson was not named in the judgment. Its appeal is thus not properly before this court.
[5] The tile is made of polyvinyl chloride, a plasticizer or phthaleinester, and resin.
[6] Naphtha is a solvent in the adhesive which evaporates rather rapidly. It is combined with asphalt to help the asphalt spread with a trowel.
[7] Minyard was decided before Media. The court in Minyard relied on pre-Media jurisprudence in finding Minyard had no redhibition action due to a lack of privity of contract. Without this finding Minyard could not have met one of the elements of an action for unjust enrichment, that it had no other remedy at law. Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422, 432-433 (1967).
[1] Stark was decided under the 1825 Code of Practice. Article 346 of that code provided: "Peremptory exceptions, founded on law, may be pleaded in every stage of the action, previous to the definitive judgment; but they must be pleaded specially, and sufficient time allowed to the adverse party to bring his evidence." This article was not changed when the 1870 Code of Practice was adopted. In O'Hara v. City of New Orleans, 30 La.Ann. 152 (1878), the court interpreted "previous to the definitive judgment" to mean before the submission of the case. O'Hara was codified in Code of Civil Procedure article 2163.