# STATE OF LOUISIANA

## COURT OF APPEAL

### FIRST CIRCUIT

\* \* \* \* \* \* \*

## 2023 CA 0986

## PONTCHARTRAIN NATURAL GAS SYSTEM, K/D/S PROMIX, L.L.C., AND ACADIAN GAS PIPELINE SYSTEM

## VERSUS

## TEXAS BRINE COMPANY, LLC, ET AL.

JUDGMENT RENDERED: <u>DEC 1 2 2024</u>

\* \* \* \* \* \* \*

Appealed from the Twenty-Third Judicial District Court
Parish of Assumption • State of Louisiana
Docket Number 34,265 • Division "Ad Hoc"

The Honorable Thomas J. Kliebert, Jr., Presiding Ad Hoc Judge

\* \* \* \* \* \* \*

| | | | |
|---|---|---|---|
| Leopold Z. Sher<br>James M. Garner<br>Jeffrey D. Kessler<br>Martha Y. Curtis<br>Neal J. Kling<br>New Orleans, Louisiana<br>  *and*<br>Robert R. Percy III<br>Gonzales, Louisiana<br>  *and*<br>Travis J. Turner<br>Gonzales, Louisiana<br>  *and*<br>Ulysses Gene Thibodeaux<br>Lake Charles, Louisiana | **COUNSEL FOR APPELLANT**<br>Texas Brine Company, LLC | Roy C. Cheatwood<br>Kent A. Lambert<br>Adam B. Zuckerman<br>Leopoldo J. Yanez<br>Lauren Brink Adams<br>Colleen C. Jarrott<br>Matthew C. Juneau<br>New Orleans, Louisiana<br>  *and*<br>Antonio M. "Tony" Clayton<br>Port Allen, Louisiana | **COUNSEL FOR APPELLEE**<br>Legacy Vulcan, LLC |

\* \* \* \* \* \* \*

**BEFORE: WELCH, PENZATO, AND GREENE, JJ.**

**WELCH, J.**

In this appeal, Texas Brine Company, LLC ("Texas Brine") seeks review of the trial court's judgment in the Phase 2 damages proceeding, as well as all interlocutory judgments and orders pertaining thereto.[1] For the following reasons, we reverse one interlocutory judgment, vacate a portion of the December 1, 2022 judgment, and we affirm all other judgments at issue in this appeal.

## BACKGROUND

This dispute is one of many arising out of a sinkhole near Bayou Corne in Assumption Parish, Louisiana that developed on or about August 3, 2012, following the collapse of a salt mine cavern. This particular suit was instituted by Pontchartrain Natural Gas System, K/D/S Promix, L.L.C., and Acadian Gas Pipeline (collectively "Pontchartrain"), owners and operators of natural gas pipelines and storage facilities in the vicinity of the property affected by the sinkhole. Pontchartrain, like other affected pipeline companies,[2] sought recovery for damage to its inoperable pipelines due to the alleged negligence of Texas Brine's operation of the Oxy Geismar No. 3 Well/Cavern ("OG3"), which collapsed and created the sinkhole.

Texas Brine responded to this lawsuit by filing incidental demands asserting tort and contract claims against various parties, including Legacy Vulcan, LLC f/k/a Legacy Vulcan Corp. and/or Vulcan Materials Company ("Legacy Vulcan"). Texas Brine sought recovery not only for its own damages in the form of

---

[1] Following submission of these judgments for this panel's consideration, the parties, *sua sponte*, supplemented the record with an amended judgment dated October 29, 2024, which in all material respects is identical to the judgments on appeal. Because this panel did not request the supplementation, and finds no material differences between the two, the supplementation will not be considered.

[2] The other pipeline companies that also filed suit against Texas Brine are Florida Gas Transmission Company, LLC ("Florida Gas") and Crosstex Energy Services, LP, Crosstex LIG, LLC and Crosstex Processing Services, LLC ("Crosstex"). Although the claims asserted by these three separate plaintiffs are similar, the parties resisted consolidation of these three matters, except for purposes of trial. Like in Phase 1, individual appeals were filed in the three separate "pipeline" cases following the joint Phase 2 damages trial.

2

reimbursement expenses for environmental response costs that it paid after the sinkhole appeared, litigation expenses, and lost profits, but also for claims of indemnity and/or contribution for the damages allegedly sustained by Pontchartrain.

As was thoroughly discussed in **Pontchartrain Natural Gas System v. Texas Brine Company, LLC**, 2018-1249 (La. App. 1st Cir. 12/30/20), 317 So.3d 715, 725, writ denied, 2021-00382 & 2021-00386 (La. 6/8/21), 317 So.3d 323, a Phase 1 liability trial was held in September of 2017, which determined the cause of the sinkhole and the fault of the parties involved. Following trial, Texas Brine, Legacy Vulcan, and a third party, Occidental Chemical Corporation ("Oxy"), all of whom were found to be at fault for the creation of the sinkhole, appealed. **Id.** at 739. With numerous assignments to consider, including whether Legacy Vulcan could be held liable for damage occasioned years after it had sold its rights and interest in the OG3 and brine business, this court made several important findings, which necessarily would affect subsequent phases in this litigation. **Id.** at 739-740. Such findings included a delineation of the parties' duties and obligations as well as the breaches thereof, which ultimately supported the allocation of fault between the parties. **Id.** at 750-59. Notably, Legacy Vulcan was held 15% liable and Texas Brine 45% liable for causing the sinkhole.[3] **Id.** at 763.

Thereafter, the next phase of this litigation, Phase 2, began. Phase 2 contemplated a joint trial to address all incidental demands and damage/quantum issues remaining between or among all or any of Texas Brine, Legacy Vulcan, and any other parties in this case, excluding all issues that were part of the Phase 1 liability trial and also excluding the quantum of any claim or award for attorneys' fees or legal/litigation costs. A case management order was issued and revised

---

[3] United Brine Services ("UBS"), a subsidiary of Texas Brine, was held 10% liable for the sinkhole. **Id.** at 728 and 763.

3

several times outlining the parameters of the Phase 2 trial. Subsequently, the parties began culling and refining the claims to be addressed in Phase 2. Through a series of pretrial motions, Legacy Vulcan challenged the inclusion of particular damages claims for which Texas Brine could be reimbursed, including Texas Brine's claims for closing costs, capitalized interest, double recovery, and certain lost opportunity damages. There were also motions filed challenging the amount of reimbursement Legacy Vulcan owed Texas Brine for damages paid to plaintiffs, including Texas Brine's intentional tort claims, and claims made under the Amended Operating Agreement. Finally, Legacy Vulcan challenged the availability of additional contractual remedies to Texas Brine under the Assignment of Salt Lease.

Following several hearings, the trial court ruled in favor of Legacy Vulcan on each of these motions. The trial court certified the following judgments as final for immediate appeal: the dismissal of Texas Brine's claim to double recover certain damages, as well as Texas Brine's claims under the Assignment of Salt Lease, and Amended Operating Agreement. Texas Brine appealed these three judgments, which appeals in turn were all dismissed by this court for failure to meet the requirements of a final appealable judgment under La. C.C.P. art. 1915(B) and **R.J. Messinger, Inc. v. Rosenblum**, 2004-1664 (La. 3/2/05), 894 So.2d 1113, 1122. See **Pontchartrain Natural Gas System v. Texas Brine Company, LLC**, 2022-0738 (La. App. 1st Cir. 12/29/22), 360 So.3d 874, 879; **Pontchartrain Natural Gas System v. Texas Brine Company, LLC**, 2022-0807 (La. App. 1st Cir. 5/19/23), 368 So.3d 670, 670-71; **Pontchartrain Natural Gas System v. Texas Brine Company, LLC**, 2022-1001 (La. App. 1st Cir. 3/1/23), 362 So.3d 952, 956-57.[4]

_____

[4] Texas Brine also unsuccessfully sought review of three other judgments not certified as final by the trial court, by filing supervisory writs with this court. See **Pontchartrain Natural Gas System v. Texas Brine Company, LLC**, 2022-0904 (La. App. 1st Cir. 11/7/22), 2022 WL

Meanwhile, Texas Brine and Legacy Vulcan continued on towards the Phase 2 trial, which began on August 15, 2022, and was held for the purpose of adjudicating damages representing past unreimbursed response costs, future response costs, and lost profits related to Texas Brine's inability to operate the Oxy Taft 11 and 12 wells. On the fourth day of trial, the parties reached a stipulation, which was read into the record. The parties agreed that Texas Brine's Phase 2 total damages amounted to $79,310,365.40, of which Legacy Vulcan owed 15% reimbursement per the comparative fault finding of the Phase 1 litigation.

On December 1, 2022, the trial court executed the Phase 2 judgment, setting Texas Brine's damages in the amount of $79,310,365.40, of which Legacy Vulcan owed 15% reimbursement, or $11,896,554.80, to Texas Brine. The judgment further ordered Legacy Vulcan to pay pre-judgment interest to Texas Brine from the date of judicial demand through October 1, 2022. It is from this judgment that Texas Brine appeals, while also seeking review of a number of interlocutory rulings.

## ASSIGNMENTS OF ERROR

1. The trial court legally erred by failing to increase Legacy Vulcan's responsibility for damages based on:

    a. The trial court's failure to apply the parties' contractual agreement that losses would be shared on a 50/50 basis.

    b. The trial court's failure to apply the mandatory provisions of La. C.C. art. 2323(C), despite the court's finding that Legacy Vulcan's intentional misconduct played a role in causing the sinkhole.

2. The trial court legally erred by denying Texas Brine the right to seek recovery from Legacy Vulcan of all sinkhole response costs based on the following:

---

16753562 (unpublished writ action); **Pontchartrain Natural Gas System v. Texas Brine Company, LLC**, 2022-0923 (La. App. 1st Cir. 11/7/22), 2022 WL 16756967 (unpublished writ action); and, **Pontchartrain Natural Gas System v. Texas Brine Company, LLC**, 2022-0961 (La. App. 1st Cir. 1/20/23), 361 So.3d 491, 497 n.1, writ denied, 2023-00255 (La. 6/7/23), 361 So.3d 983.

a. The trial court's failure to apply Louisiana's collateral source rule and wrongfully allowing Legacy Vulcan to reduce its liability for causing damages incurred in response to the sinkhole.

b. The trial court's finding that Texas Brine contractually waived any recovery from Legacy Vulcan of monies reimbursed by insurance because the trial court wrongfully interpreted the parties' contracts and ignored previously-recognized material fact issues.

c. The trial court barred, as untimely, Texas Brine from presenting testimony or evidence supporting Texas Brine's claim for lost business opportunities, even though Texas Brine timely complied with all deadlines in the case management order.

d. The trial court ignored genuine issues of material fact and dismissed Texas Brine's claim for the carrying costs of capital.

e. The trial court failed to require Legacy Vulcan to pay sinkhole response costs incurred by Texas Brine to buy out Bayou Corne homeowners, at the direction of the Governor.

3. The trial court legally erred by ignoring this court's imposition of fault on Legacy Vulcan in the liability ruling for breaching its duties as the mineral lessee and dismissing Texas Brine's contractual right to recover attorneys' fees.

## APPELLATE JURISDICTION

Generally, when an unrestricted appeal is taken from a final judgment determinative of the merits, the appellant is entitled to seek review of all adverse and prejudicial interlocutory judgments, in addition to the review of the final judgment. **Carrollton Presbyterian Church v. Presbytery of South Louisiana of Presbyterian Church (USA)**, 2011-0205 (La. App. 1st Cir. 9/14/11), 77 So.3d 975, 978-79, writ denied, 2011-2590 (La. 2/17/12), 82 So.3d 285, cert. denied sub nom, **Presbytery of South Louisiana v. Carrollton Presbyterian Church of New Orleans**, 568 U.S. 818, 133 S.Ct. 150, 184 L.Ed.2d 32 (2012). In the case of a restricted appeal, an appellant *may also* appeal an interlocutory judgment involving the same or related issues. **Id.** at 979. The trial court's rulings on motions for partial summary judgment and motions to strike are interlocutory

judgments. La. C.C.P. arts. 1915(A)(3), 1841 & 2083; **Louisiana Safety Ass'n of Timbermen v. Carlton**, 2012-0775 (La. App. 1st Cir. 12/21/12), 111 So.3d 1076, 1081 n.3. The merits of the present appeal concern the quantum of damages owed following the Phase 1 liability trial. The motions require determinations of whether certain expenditures should be classified as damages to be apportioned between the parties, and whether any prior ruling or contractual clause between these parties would augment the contribution allocation determined in the previous phase of litigation. Because the trial court's interlocutory rulings on these issues are so clearly interrelated with the quantum judgment, it is appropriate to consider the merits of all of Texas Brine's assignments of error regarding these multiple judgments. See **Stevens v. St. Tammany Parish Government**, 2016-0534 (La. App. 1st Cir. 1/18/17), 212 So.3d 568, 578.

As there are distinct sets of claims being appealed, we will address each accordingly, beginning with claims reducing the recoverable amount of damages that were dismissed by the trial court and therefore not included in the final quantum damage calculation. Next, we will discuss the availability of any additional contractual remedies to Texas Brine. Finally, we will determine the viability of claims that would reapportion the reimbursement owed by Legacy Vulcan to Texas Brine.

## SUMMARY JUDGMENT[5]

Appellate courts review the grant or denial of a motion for summary judgment *de novo* using the same criteria applied by the trial courts to determine whether summary judgment is appropriate. **Georgia-Pacific Consumer Operations, LLC v. City of Baton Rouge**, 2017-1553, 2017-1554 (La. App. 1st Cir. 7/18/18), 255 So.3d 16, 22, writ denied, 2018-1397 (La. 12/3/18), 257 So.3d

---

[5] Although the Legislature recently amended La. C.C.P. art. 966, those amendments are not applicable to the instant appeal. See 2023 La. Acts No. 317, § 1 (eff. Aug. 1, 2023), and 2023 La. Acts No. 368, § 1 (eff. Aug. 1, 2023).

194. After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3); **Campbell v. Dolgencorp, LLC**, 2019-0036 (La. App. 1st Cir. 1/9/20), 294 So.3d 522, 526.

The burden of proof on a motion for summary judgment rests with the mover. La. C.C.P. art. 966(D)(1); **Lucas v. Maison Insurance Co.**, 2021-1401 (La. App. 1st Cir. 12/22/22), 358 So.3d 76, 84. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense. Instead, after meeting his initial burden of showing that there are no genuine issues of material fact, the mover may point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, summary judgment shall be granted unless the adverse party can produce factual evidence sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. See La. C.C.P. art. 966(D)(1); **Lucas**, 358 So.3d at 84.

## DOUBLE RECOVERY/COLLATERAL SOURCE

On November 16, 2021, Legacy Vulcan filed a motion for partial summary judgment seeking to dismiss Texas Brine's claims for double recovery of insured losses and liabilities. Within this motion, Legacy Vulcan sought to dismiss with prejudice, Texas Brine's claims for double recovery from Legacy Vulcan under the collateral source rule for losses and liabilities related to the sinkhole that had already been paid or reimbursed to Texas Brine by its liability insurers. Legacy Vulcan asserted that Texas Brine was prohibited from such recovery because the collateral source rule did not apply to Texas Brine, as it was a tortfeasor and not a

8

tort victim. Legacy Vulcan further argued that Texas Brine was not entitled to these damages because contractually, Texas Brine had expressly waived its right to such recovery, citing Section 7.4 of the Amended and Restated Facilities Lease Agreement

In support of its argument, Legacy Vulcan attached as evidence a copy of the Phase 1 opinion, **Pontchartrain Natural Gas System**, 317 So.3d at 763, wherein Texas Brine, along with Legacy Vulcan, were named as liable parties for the cause of the sinkhole and apportioned shares of fault. Legacy Vulcan also entered into evidence several of the contracts between the parties including the Amended and Restated Facilities Lease Agreement, which provides in pertinent part:

> Section 7.4 Mutual Waiver of Subrogation Rights. Whenever (a) any loss, cost, damage or expense resulting from fire, explosion or any other liability, casualty or occurrence is incurred by either of the parties to this Lease in connection with the Leased Premises, and (b) such party is then covered in whole or in part by insurance with respect to such loss, cost, damage or expense, then the party so insured hereby releases the other party from any liability it may have on account of such loss, cost, damage or expense to the extent of any amount recovered by reason of such insurance and waives any right of subrogation which might otherwise exist in or accrue to any person on account thereof, provided that such release of liability and waiver of the right of subrogation shall not be operative in any case where the effect thereof is to invalidate such insurance coverage or increase the cost thereof...

Additionally, the Amended and Restated Operating and Supply Agreement contains the following provisions:

> Section 12.4 Insurance. During the term of this Agreement, Texas [Brine] shall take out, or cause to be taken out, and shall maintain liability and other insurance with respect to its operation of the Leased Premises, insuring against such risks as are customarily insured against by businesses similarly situated and operating like properties, including, but not necessarily limited to the following insurance:
> ***
> (d) Commercial general liability insurance with limits of $5,000,000, combined single limit, including contractual liability coverage which shall specifically cover the indemnity of this

9

Agreement, products/completed operations and XCU (explosion, collapse and underground) coverages.

...The policy or policies of insurance required under Sections 12.4(c) and 12.4(d) hereof shall name [Legacy] Vulcan as an additional insured, and the commercial general liability insurance required under Section 12.4(d) hereof shall be primary as to any insurance or self-insurance programs of [Legacy] Vulcan.

Legacy Vulcan also included the deposition testimony of Fred Wolgel, a corporate attorney providing legal services to various entities within the "Texas" framework, through Texas United Management, and several discovery responses attached thereto. These documents were presented to demonstrate that Texas Brine's patrimony was not diminished by the acquisition of these insurance policies because Texas Brine's affiliate purchased these policies on Texas Brine's behalf and requested Texas Brine only pay a portion of the premiums, which Texas Brine allocated to its customers.

Texas Brine opposed this motion, arguing that its insurance policies were a collateral source of money from which Legacy Vulcan had no legal right to benefit by way of reducing its monetary judgment to Texas Brine. Texas Brine opined that it is a tort victim even though it may be partially liable for the sinkhole, and no Louisiana case holds that a partially liable defendant – who suffered its own, distinct damages – was prohibited from invoking the collateral source rule against another partially liable defendant, for its own damages. Furthermore, Texas Brine argued that none of the contracts cited by Legacy Vulcan apply to prohibit Texas Brine's double recovery because the Amended Facilities Lease does not encompass the OG3, and Legacy Vulcan was not a party to the Amended Operating Agreement at the time of the sinkhole.

A hearing on this motion was held on December 16, 2021. Following party arguments, the matter was taken under advisement. On January 18, 2022, the trial court signed a judgment granting Legacy Vulcan's motion for partial summary

judgment dismissing Texas Brine's claims for double recovery of insured losses and liabilities with prejudice, finding that Texas Brine could not recover from Legacy Vulcan for losses that had already been paid by Texas Brine's own insurers.

On appeal, Texas Brine presents several arguments regarding why it should be allowed to double recover certain damages already reimbursed to it by its liability insurers from Legacy Vulcan.[6] Texas Brine asserts that the trial court deviated from Louisiana law in failing to apply the collateral source rule to Texas Brine's insurance proceeds because Texas Brine was adjudicated to be most culpable for the sinkhole. However, Texas Brine argues, a tort victim's culpability is not a feature of the collateral source rule, and instead it applies to *all* tort victims, even tort victims partially at fault. (Emphasis in original). Texas Brine argues that one of the main pillars of the collateral source rule, tort deterrence, would be hampered if Legacy Vulcan is allowed to benefit from Texas Brine's prudence in obtaining insurance. In so doing, Texas Brine emphasizes its status as a tort victim with independent tort claims against Legacy Vulcan, which entitles it to application of the collateral source rule. Last, Texas Brine argues that the trial court erred in ruling that Texas Brine released Legacy Vulcan from tort claims covered by insurance by applying provisions of certain contracts between the parties.

---

[6] Briefly, Texas Brine begins by stating that Legacy Vulcan's motion was granted although it lacked any evidence of what sinkhole response costs were paid by Texas Brine's insurers. We note that the collateral source rule is a rule of evidence and damages. From an evidentiary perspective, the rule bars the introduction of evidence that a plaintiff has received benefits or payments from a collateral source independent of the tortfeasor's procuration or contribution. **Bozeman v. State**, 2003-1016 (La. 7/2/04), 879 So.2d 692, 699. In this litigation, Legacy Vulcan included as evidence the insurance policies in effect at the time of the sinkhole, which the parties concede for this purpose, were the only contributing policies to the liability judgment against Texas Brine. Legacy Vulcan further attached the affidavit of Fred Wolgel who attested to certain amounts of liability insurance having been paid to Texas Brine by the named companies. We find Legacy Vulcan's evidence sufficient to demonstrate the amount that Texas Brine was provided in insurance proceeds for sinkhole response costs such that the trial court and parties know the amount of damages to be withheld from the total damages award because of these payments.

The collateral source rule provides that a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies the plaintiff receives from sources independent of the tortfeasor's procuration or contribution. **Bozeman v. State**, 2003-1016 (La. 7/2/04), 879 So.2d 692, 698. Under the rule, payments received from an independent source are not deducted from the award a tort victim would otherwise receive from the tortfeasor, because the tortfeasor is not allowed to benefit from outside benefits provided to the tort victim. **Id.** The rule reflects the beliefs that the tortfeasor should not profit from the victim's prudence in obtaining insurance, or benefitting from other sources, and that reducing the amount the tortfeasor would have to pay hampers the deterrent effect of the law. **Bellard v. American Central Insurance Co.**, 2007-1335 (La. 4/18/08), 980 So.2d 654, 668.

As set forth in **Bellard**, 980 So.2d at 668, a troubling aspect of the collateral source rule for Louisiana courts is the "double recovery" or "windfall" that might arise as a consequence of the victim's receipt of an outside payment. The guiding principles of awarding tort damages are to deter wrongful conduct and to make the victim whole. This goal is thwarted, and the law is violated, when the victim is allowed to recover the same element of damages twice. **Id.** However, the Louisiana Supreme Court has determined that an objectionable "windfall" does not occur when the injured party's patrimony was diminished to the extent that he was forced to recover against outside sources, and the diminution of his patrimony constituted additional damages suffered. **Cutsinger v. Redfern**, 2008-2607 (La. 5/22/09), 12 So.3d 945, 953, citing **Bozeman**, 879 So.2d at 699.

The Louisiana Supreme Court, recognizing this conflict, has provided guidance on the issue, promulgating two considerations to guide a court's determination with respect to the applicability of the collateral source rule: (1) whether applying the rule will further the major policy goal of tort deterrence; and

12

(2) whether the victim, by having a collateral source available as a source of recovery, either paid for such benefit or suffered some diminution in his patrimony because the benefit was available, such that he is not reaping a windfall or double recovery. **Cutsinger**, 12 So.3d at 953.

After careful consideration, we agree with the trial court in finding the collateral source rule inapplicable in this instance. Based on the Phase 1 liability trial, the tortious actions by both Texas Brine and Legacy Vulcan caused damage to Pontchartrain, and resulted in both parties being held liable for same, such that the parties could be solidary obligors to Pontchartrain. See La. C.C. arts. 1794 & 1804. There was no adjudication that Texas Brine was the victim of a tort, although it asserted several claims against Legacy Vulcan, including negligent misrepresentation and fraudulent inducement. Texas Brine may have been the obligor/tortfeasor who initially rendered performance to plaintiffs, but that does not make Texas Brine a tort victim, only the possessor of a right of contribution. See La. C.C. art. 1805. Looking at the underlying policies of the collateral source rule, as between two tortfeasors attempting to quantify amounts of contribution, the goal of tort deterrence does not appear to be furthered at all. Thus, this argument in favor of the collateral source rule is unpersuasive. In so finding, we pretermit discussion of whether any contractual waiver applies to override collateral source application. We affirm the trial court's January 18, 2022 judgment dismissing with prejudice Texas Brine's claims for double recovery of insured losses and liabilities, finding that Texas Brine cannot recover from Legacy Vulcan for losses that have been paid by Texas Brine's liability insurers.

## CLOSING COSTS AND APPRAISAL FEES

On May 19, 2022, Legacy Vulcan filed a motion for partial summary judgment seeking to dismiss with prejudice Texas Brine's claims for closing costs and appraisal costs associated with voluntary settlement acquisitions of Bayou Corne properties. This motion sought specifically to dismiss Texas Brine's claim for costs associated with vendors, Commerce Title & Abstract Company and Right of Way Services, Inc., which Texas Brine claimed provided "property maintenance" services in response to Directive 1 of the Fourth Amendment to Declaration of Emergency and Directive ("Directive 1") issued to Texas Brine by the Louisiana Department of Natural Resources.[7] Legacy Vulcan urged that contrary to Texas Brine's assertions, Texas Brine's claims for these response costs had little to do with Directive 1, which mandated that Texas Brine upgrade ventilation systems in homes near the sinkhole – not purchase the properties outright. Because these costs were not required for compliance with Directive 1, and the result of these buyouts was the release of the property owners' claims against Texas Brine only, Legacy Vulcan argued these costs should not be considered response costs for which Legacy Vulcan is now required to reimburse Texas Brine. Legacy Vulcan further argued that Texas Brine, itself, designated this particular group of buyouts as "voluntary" settlements. Alternatively, Legacy Vulcan asserted that because these transactional costs were incurred in connection with the purchase of property, they should be classified as legal fees, not damages.

In support of its motion, Legacy Vulcan attached in pertinent part, Texas Brine's fourth supplemental and amended responses and objections to discovery and chart of damages. In this discovery, Texas Brine identified as response costs, payments made to Commerce Title & Abstract Company and Right of Way

---

[7] Texas Brine's payments to these two companies were only in relation to their services regarding the purchase of these properties.

Services, Inc. in conjunction with Directive 1. Legacy Vulcan also attached Directive 1, which provides in pertinent part:

> **It is hereby declared** that in response to the emergency subsidence incident and gas migration events covered herein and by the emergency declaration and amended emergency declarations effective August 3, 2012, August 9, 2012, September 25, 2012, and October 11, 2012 respectively, [Texas Brine] is **hereby ordered** to undertake any and all necessary actions to assess for and abate threats to safety and the environment, including the abatement of natural gas accumulation in the aquifer and aquitard.
>
> **It is further declared** that [Texas Brine] is specifically directed and is **hereby ordered** to undertake the necessary actions to address the potential danger to human life associated with the gas pressures mentioned above and at a minimum perform all of the following within the deadlines set forth below:
>
> **1)** Immediately upon obtaining permission of the owner(s), upgrade ventilation of slab-on-grade homes or slab-on-grade structures by providing for ventilation improvements on spaces within the structure that are not adequately ventilated, and provide for the installation in these spaces permanent LEL instrumentation connected to an alert/monitoring system continuously monitored by a bonded/qualified independent contract response team to immediately respond to all alarms for all homes or structures with slab-on-grade construction located within the evacuation area established by Assumption Parish...In order to comply with this directive and order [Texas Brine] may also undertake other actions which are of equal or greater protective value to the protection of public safety as approved by this office that may terminate the necessity for continuous monitoring as described herein.

Legacy Vulcan also attached excerpts from the deposition taken on March 25, 2022, of Bruce Martin, the President of United Brine Services ("UBS"), Texas Brine's wholly owned subsidiary. Mr. Martin, appearing as Texas Brine's corporate representative in accordance with La. C.C.P. art. 1442 during this deposition, testified that a company named Bayou Corne Holdings, LLC, not Texas Brine, was the actual purchaser and owner of these particular properties, and remains the title holder of these properties. When describing the different groups of residents or residential property owners with whom Texas Brine settled, Mr. Martin attested as follows:

I would put it as there was a group that wanted – that requested voluntary buyouts. I don't know if they actually had lawsuits or claims against us, but they requested voluntary buyouts. That was the first group.

And then there was all of the parties to the LeBlanc class action, those that wanted to settle and move on. And then there was the opt-outs...

Legacy Vulcan urges that the first group, labeled as "voluntary" by Mr. Martin, is the subject of this motion.

Texas Brine opposed the motion arguing that the acquisition of properties around Bayou Corne was anything but voluntary, as Texas Brine was confronted with threats by Louisiana state government officials that it would either purchase these properties or face going out of business in Louisiana. Texas Brine explained that from the instant the sinkhole emerged, it was bombarded with directives, orders, and proclamations by the State of Louisiana, which referenced the obligations that Texas Brine undertook in its permits for operation of the OG3, including assisting with resident evacuations. Texas Brine asserted that in combination with closed-door meetings and press releases, it understood that acquiring these residences was not optional. Texas Brine maintained that, because the buyouts were not optional and were a result of the sinkhole, they were a necessary response cost, and Legacy Vulcan should be made to pay its virile share of same.

Pertinent evidence attached in support of Texas Brine's opposition was the affidavit of Bruce Martin, dated June 6, 2022, who attested to the following:

7. In connection with the state-mandated directives, Texas Brine was ordered to, among other things, (1) contain the water inside the sinkhole, (2) assess the stability of the western edge of the Napoleonville Salt Dome, (3) address subsidence concerns in the area, (4) investigate the presence of methane and hydrocarbons trapped in the local groundwater aquifer, (5) monitor air quality, and (6) make evacuation payments to residents of the Bayou Corne community.

\*\*\*

10. On August 3, 2012, when the sinkhole appeared, Assumption Parish Office of Homeland Security and Emergency

16

Preparedness ordered a mandatory evacuation – effective immediately – of residents ranging "from the home of Randy Rousseau south to all residents within the Bayou Corne Community."

\*\*\*

12. The State of Louisiana (through the Louisiana Department of Natural Resources) issued multiple directives that compelled Texas Brine to incur various response costs, including directives to make assistance payments to residents in the community who were forced to evacuate.

\*\*\*

14. The August 17, 2012 LDNR Compliance Order referenced the Permit for the well at issue, which specifically recites that if there is a collapse (such as the sinkhole) and there is a threat to any residents "the occupants will be assisted if evacuation is required."

15. Texas Brine ultimately paid evacuation assistance payments totaling $11,949,724.16.

16. Throughout its response to the Sinkhole, Louisiana State and Assumption Parish local officials consistently pressured Texas Brine to compensate the residents of the Bayou Corne community by acquiring the properties of residents who wanted to leave as a result of the Sinkhole.

17. While the residents of the community were given the option to retain their properties, Texas Brine understood that offering to acquire these homes was not optional, as state and local officials required Texas Brine to issue the buyout offers in direct response to the Sinkhole.

18. In particular, Texas Brine officials, including myself, met with then-Governor Bobby Jindal to discuss the need for Texas Brine to buy the residents' properties in response to the Sinkhole.

19. Then, in May 2013, at a press conference in the Bayou Corne community that was held to discuss Texas Brine's alleged inaction to actually offer buyout agreements, Governor Jindal told the Bayou Corne community and anyone listening to the press conference, including Texas Brine, that Texas Brine needed to "make things right" with Bayou Corne residents by offering settlement buyouts.

20. Texas Brine understood Governor Jindal's message, and the issuance of Executive Order BJ 13-08 as an instruction for Texas Brine to offer buyout options to the homeowners in Bayou Corne who wanted to sell their properties. Texas Brine perceived this instruction as mandatory, non-optional, and non-negotiable.

\*\*\*

26. In response to [Executive Order BJ 13-08], and after continual threats that its work permits throughout Louisiana would be highly scrutinized and potentially suspended, revoked, or terminated, Texas Brine had no choice but to offer buyout opportunities for the residents of Bayou Corne.

27. In exchange for purchasing the properties, Texas Brine also obtained a release of each accepting homeowner's sinkhole-related claims and the termination of evacuation assistance payments.

28. Texas Brine entered into these agreements because both the Governor and local officials demanded that Texas Brine offer these settlement buyouts to the residents of Bayou Corne.

Attached to the affidavit were certain documents referenced therein, including the original Declaration of Emergency issued on August 3, 2012, noting Texas Brine, as the operator of record of the OG3, was required to take immediate action to thoroughly evaluate the integrity of the OG3 and to undertake all appropriate action to abate and halt the deterioration of the cavern's integrity. Also attached was correspondence dated the same day, from the State to Texas Brine, alerting it to the issuance of the Emergency Declaration, and that as operator it was advised to take all appropriate steps to protect against environmental damage and prevent threats to public safety associated with the subsidence incident. Texas Brine was also put on notice that additional action may be ordered by the State as deemed necessary.

The August 17, 2012 LDNR Compliance Order referenced in Mr. Martin's affidavit was also attached. Within this order, the State reminded Texas Brine that in its permit application to operate these three wells Texas Brine agreed that in the event of the appearance of symptoms of acute subsidence, i.e. sinkhole formation, it would take a number of steps, including assisting in residential evacuation if a residential area appeared to be threatened by the collapse. The Order further recited that on or about August 2 and 3, 2012, a subsidence formation (sinkhole) formed in a wooded area located between Bayou Corne and Grand Bayou in the vicinity of the referenced wells, causing State officials to order a mandatory evacuation effective immediately, "from the home of Randy Rousseau south to all residents within the Bayou Corne Community." Texas Brine then announced the

18

creation of a housing assistance fund for residents living around the Bayou Corne Community in the area under the mandatory evacuation order, on or about August 16, 2012, which would be available the following day. However, because this assistance was not provided from the time when the evacuation was actually ordered, Texas Brine was in violation of its permit obligations and Louisiana law. .

Finally, in its effort to demonstrate that these buyouts were mandatory, Texas Brine also attached as evidence Executive Order No. BJ 2013-08 (signed May 20, 2013), which provided in pertinent part:

> **WHEREAS**, on March 14, 2013, Texas Brine officials met with State and local officials and pledged to extend settlement offers over the following several weeks, including buyouts, to residents forced to evacuate their homes as a result of the threat posed by the sinkhole at Bayou Corne, and further agreed to reimburse local and state officials for the response costs associated with this incident; and
>
> **WHEREAS**, as of this date, Texas Brine has missed multiple deadlines to extend these settlement offers and no such buyouts have occurred, calling into question the willingness of Texas Brine to fulfill its pledge to the residents of Bayou Corne and others impacted by its operations, the company's financial ability to meet the obligations created by its salt dome operations in Assumption Parish, and the adequacy of its insurance coverage for its operations in Assumption Parish and elsewhere at any of its other permitted sites in the State of Louisiana; and
>
> **NOW THEREFORE**, I, Bobby Jindal, Governor of the State of Louisiana, by virtue of the authority vested by the Constitution and the laws of the State of Louisiana, do hereby order and direct as follows:
>
> **SECTION 1**: The Commissioner of Conservation shall conduct a complete review of the permits issued to Texas Brine in connection with its operations of salt cavern wells in the vicinity of Section 40, Township 12 South, Range 13 East, in Assumption Parish, as well as all permits issued to Texas Brine throughout the State, in order to determine if Texas Brine's current financial condition indicates that such permit(s) should be modified, revoked and reissued, or terminated.
>
> **SECTION 2**: All departments, commissions, boards, offices, entities, agencies, and officers of the State of Louisiana, or any political subdivision thereof with any regulatory program implicated by the emergency situation near Bayou Corne in Assumption Parish, shall review to determine whether Texas Brine remains capable of meeting its regulatory obligations...

**SECTION 3**: In light of Texas Brine's inability to meet its previous commitments, the Commissioner of Conservation shall conduct a review of the ongoing financial ability of Texas Brine to meet the financial obligations resulting from its salt dome operations in Assumption Parish and elsewhere at any of its other permitted sites in the State of Louisiana, as well as the adequacy of its insurance coverage for the company's operations in Assumption Parish and elsewhere at any of its other permitted sites in the State of Louisiana.

A hearing on this motion took place on June 21, 2022. Following party arguments, the trial court granted this motion, finding these particular damages were not sufficiently related to response costs. A judgment reflecting the oral ruling was signed by the trial court on July 19, 2022, dismissing with prejudice Texas Brine's claim against Legacy Vulcan for alleged costs associated with vendors, Commerce Title & Abstract Company and Right of Way Services, Inc., to recover closing costs and appraisal costs associated with Texas Brine's voluntary acquisition of properties in Bayou Corne following the sinkhole.

On appeal, Texas Brine argues that buyouts of properties that are the subject of environmental litigation are common practice. In its effort to demonstrate the trial court's error in granting this motion, Texas Brine recounts the evidence it presented in opposition to this motion, including the initial mandatory evacuation of residents when the sinkhole appeared, and that Texas Brine was warned of "dire consequences" if it did not comply with its permitting obligations, as well as the public criticism the State gave Texas Brine in Executive Order BJ 2013-08. Tying it all together, Texas Brine cites to Mr. Martin's affidavit, which explained that throughout these exchanges, the State was demanding that Texas Brine acquire these properties and threatening to revoke Texas Brine's permits to operate anywhere in Louisiana if the buyouts did not occur.

Looking at the motion and evidence presented by both parties we agree with the trial court's ruling. Legacy Vulcan filed a motion for partial summary judgment to dismiss Texas Brine's claims for closing costs and appraisal costs paid

to Commerce Title & Abstract Company and Right of Way Services, Inc. for acquisition of homes in the Bayou Corne community, in response to Directive 1. Legacy Vulcan demonstrated that these buyouts were not responsive to Directive 1, as that directive only required natural gas abatement in and around those residences. Furthermore, Legacy Vulcan presented deposition testimony of Mr. Martin, who had described these buyouts as voluntary via requests of residents despite any actual claim status. At that point, the burden shifted to Texas Brine to produce factual evidence sufficient to establish the existence of a genuine issue of material fact or that Legacy Vulcan was not entitled to judgment as a matter of law. See La. C.C.P. art. 966(D)(1).

Texas Brine attempted to satisfy its burden by changing the impetus of the buyouts from Directive 1, which was the reason listed in its discovery responses, to several different State documents, namely Executive Order BJ 2013-08 to prove the necessity of the buyouts. However, these orders and proclamations only recited that Texas Brine had obligated itself during the permitting process, to assist with residential evacuations and that it had previously pledged to State officials that it would extend settlement offers to affected residents. The documents further demonstrated that the State voiced concerns, given Texas Brine's failure to fulfill its own pledges and permitting obligations following the sinkhole, that Texas Brine may be financially unable to do so, leaving the State to question the economic fitness of Texas Brine in comparison to the scale of its operations in Louisiana. Texas Brine's key evidence in support of its argument was Mr. Martin's affidavit, which stated that State officials told Texas Brine to acquire these properties, and although there is no document directly mandating the acquisition, Texas Brine understood that the acquisitions had to be made in order to remain in business in Louisiana.

In regards to the circumstances surrounding the buyouts, Mr. Martin's prior testimony taken during his March 2022 corporate deposition, described these buyouts as that of a group "that requested voluntary buyouts," without necessarily having any lawsuit or claim against Texas Brine. Later, in his June 2022 affidavit, filed in support of this opposition, Mr. Martin attested that these buyouts occurred due to government pressure. With regard to the information contained in Mr. Martin's affidavit concerning the cause of these buyouts, we find the affidavit testimony to be contrary to Mr. Martin's previous La. C.C.P. art. 1442 deposition testimony. A subsequent affidavit in contradiction to prior deposition testimony is not sufficient to create an issue of fact precluding summary judgment without some explanation or support for the contrary statement. **Christophe v. Washington**, 2017-0512 (La. App. 1st Cir. 2/14/19), 272 So.3d 106, 111, citing **McCastle-Getwood v. Professional Cleaning Control**, 2014-0993 (La. App. 1st Cir. 1/29/15), 170 So.3d 218, 222; see also **Douglas v. Hillhaven Rest Home, Inc.**, 97-0596 (La. App. 1st Cir. 4/8/98), 709 So.2d 1079, 1083, writ denied, 98-1793 (La. 10/30/98), 727 So.2d 1161; **LeBlanc v. Dynamic Offshore Contractors, Inc.**, 626 So.2d 16, 21 (La. App. 1st Cir. 1993). Because Texas Brine does not offer any explanation for Mr. Martin's inconsistent testimony, we find that the affidavit is not sufficient evidence to create a genuine issue of fact precluding summary judgment. We further find that the remaining evidence presented did not sufficiently demonstrate that the buyouts were mandated by the State rather than initiated by Texas Brine. Therefore, Legacy Vulcan is entitled to summary judgment as a matter of law.

For these reasons, we affirm the trial court's July 19, 2022 judgment granting Legacy Vulcan's motion for partial summary judgment dismissing with prejudice Texas Brine's claims for closing and appraisal costs associated with

vendors, Commerce Title & Abstract Company and Right of Way Services, Inc., in connection with Texas Brine's acquisition of the Bayou Corne properties.

## CAPITALIZED INTEREST

On May 23, 2022, Legacy Vulcan moved for partial summary judgment seeking to dismiss Texas Brine's capitalized interest claim with prejudice. In this motion, Legacy Vulcan argued that Texas Brine's capitalized interest claim should be dismissed because it impermissibly duplicates statutory judicial interest as compensation for the lost use of funds Texas Brine claims to have spent responding to the sinkhole. Legacy Vulcan further argued that because the trial court previously ruled that such a claim is impermissible under Louisiana law, Legacy Vulcan was entitled to judgment as a matter of law.

In its accompanying memorandum, Legacy Vulcan urged that with this claim, Texas Brine sought to recover from Legacy Vulcan, all damages attributable to Texas Brine's inability to invest or earn income upon funds which it spent out-of-pocket to respond to the emergence of the sinkhole. Legacy Vulcan further asserted that this claim was nearly identical to a Pontchartrain claim previously litigated against Texas Brine. Legacy Vulcan further pointed out that Texas Brine vigorously and successfully opposed Pontchartrain's right to recover capitalized interest damages as Texas Brine argued that Louisiana law did not recognize such a claim when the capital was taken from the company rather than borrowed. Legacy Vulcan noted that Texas Brine previously argued that claiming as damages the lost use of one's own capital, because it was used for a repair, was not possible in Louisiana because such damages were the same as prejudgment interest, which was an available remedy in this litigation. Legacy Vulcan argued that like Pontchartrain's claim, none of Texas Brine's capitalized interest claims resulted from the borrowing of funds for the specific use of funding response costs. Rather, Texas Brine paid expenses with its own capital, which Texas Brine had previously

argued, did not qualify as appropriate damages under capitalized interest. Legacy Vulcan asserted this legal issue was already determined between Pontchartrain and Texas Brine, with the trial court finding in favor of Texas Brine. For the same reasons, summary judgment should now be granted in favor of Legacy Vulcan, dismissing Texas Brine's capitalized interest claims.

In support of its motion Legacy Vulcan attached, in pertinent part, Texas Brine's post-trial memorandum (in opposition to Pontchartrain's capitalized interest claim) wherein Texas Brine described Pontchartrain's capitalized interest claim as one for the alleged opportunity costs incurred in not making an investment with the funds used for repairs, arguing that courts have equated such claims for capitalized interest or lost opportunity costs to a claim for prejudgment interest. Texas Brine further asserted that in this litigation, prejudgment interest is recoverable as a matter of law so the court should not permit Pontchartrain to recover once for capitalized interest and then recover prejudgment interest because the two claims are essentially for the same element of damages and would constitute double recovery. Further, Texas Brine argued that had Pontchartrain actually incurred debt and paid interest on funds borrowed to complete its repairs, that would be recoverable, citing **Firmin, Inc. v. Denham Springs Floor Covering, Inc.**, 595 So.2d 1164, 1171 (La. App. 1st Cir. 1991).

Legacy Vulcan also attached the trial court's May 2019 Phase 2 judgment between Pontchartrain and Texas Brine, as well as its reasons for judgment. In its reasons, the court concluded that Louisiana law does not permit recovery of capitalized interest in tort cases as a matter of law, finding that if Pontchartrain had actually incurred and paid interest on funds borrowed for the express purpose of funding the repairs, those funds would be recoverable. However, because Pontchartrain did not borrow any funds for the specific purpose of completing its repairs such relief was not afforded to it. The trial court continued that Louisiana

24

law permits the recovery of prejudgment legal interest in tort, which is very similarly defined by the Louisiana Supreme Court to Pontchartrain's description of its claim for recovery of capitalized interest. Thus, the award of prejudgment interest would make Pontchartrain whole for the loss of use of funds incurred in the post-sinkhole repairs.

In further support of its motion, Legacy Vulcan attached as evidence, various amended pleadings by Texas Brine wherein it described its capitalized interest claim as its inability to invest or earn income upon the funds which it spent out-of-pocket to respond to the emergence of the sinkhole.

In opposition, Texas Brine offered several arguments to distinguish itself and its claims from Pontchartrain, including emphasizing the fact that Pontchartrain's "capitalized interest" claim was dismissed only after a trial on the merits, not on summary judgment, during which only facts and evidence regarding Pontchartrain's claim were taken into consideration. Texas Brine asserted that it should be afforded its day in court to present its own evidence and facts regarding its own claim. Texas Brine attached evidence to prove its historic business practices and operating philosophies regarding reinvestment back into itself to grow as a company, as well as the post-sinkhole liquidity crisis it suffered. Texas Brine also argued that the lone Louisiana case mentioning recoverability of capitalized interest, **Firmin**, did not create *jurisprudence constante*, and is not as relevant as Legacy Vulcan would have the court believe.

Following submission of this motion to the trial court for ruling on the pleadings pursuant to an agreement by the parties and the trial court, by judgment signed on July 19, 2022, the trial court granted this motion for partial summary judgment, and dismissed Texas Brine's claim against Legacy Vulcan for capitalized interest (also interchangeably characterized as "imputed interest" and "economic carrying cost of receivables") with prejudice.

25

Texas Brine now appeals this judgment arguing that courts from across the country recognize this type of loss as legally cognizable. Texas Brine asserts that the trial court ignored the ample record evidence demonstrating Texas Brine's decades-long practice of investing in its growth; but with the onslaught of the sinkhole response costs, Texas Brine suffered a liquidity crisis and the money normally used for investment had to be put towards response costs instead. Because the same dollar cannot be used twice, for reinvestment and response, Texas Brine urges its claim is cognizable and well-documented. Lastly, Texas Brine argues that the trial court erred in dismissing Texas Brine's claim on summary judgment solely because it previously denied a claim by Pontchartrain, for losses caused by its alleged inability to invest its own funds.

Judicial estoppel prohibits parties from deliberately changing positions according to the exigencies of the moment. The doctrine is intended to prevent the perversion of the judicial process and prevents playing fast and loose with the courts. **Lowman v. Merrick**, 2006-0921 (La. App. 1st Cir. 3/23/07), 960 So.2d 84, 92. In determining whether to apply judicial estoppel, courts look to whether: (1) the party against whom judicial estoppel is sought has asserted a legal position that is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently. **Hawkins v. Meridian Resource and Exploration, LLC**, 2016-1545 (La. App. 1st Cir. 12/6/17), 236 So.3d 610, 618, writ denied, 2018-0027 (La. 4/16/18), 240 So.3d 920. Because Legacy Vulcan's argument in favor of summary judgment was one of estoppel, we will look to the factors to determine its applicability in this instance.

In considering the first prong of this test, whether Texas Brine has asserted a legal position that is plainly inconsistent with a prior position, we find that it has. In defending against Pontchartrain's claim for capitalized interest damages, which too sought damages for the lost use of capital that would have otherwise been

26

reinvested within the company rather than repairs to pipelines damaged by the sinkhole, Texas Brine asserted that such damages are not recoverable under Louisiana law because it would be duplicative of prejudgment interest. Texas Brine explained that the Louisiana Supreme Court defined prejudgment interest as "the use which the defendant has had of the money found to be owed to the plaintiff." Texas Brine further asserted that had Pontchartrain actually incurred and paid interest on funds borrowed to complete repairs, those funds would be recoverable, citing **Firmin**, 595 So.2d at 1171. Concluding, Texas Brine argued, Pontchartrain was not entitled to an award for its alleged lost use of funds, given that the capitalized interest Pontchartrain sought to recover did not represent expenditures resulting from the borrowing of funds, but was essentially a claim to recover prejudgment legal interest twice. Thus, Texas Brine urged the trial court to refuse Pontchartrain's request for recovery of capitalized interest, especially since prejudgment interest was recoverable in this case. Presently, Texas Brine argues just the opposite, that despite any availability of prejudgment interest, it should be able to recover as damages the lost use of capital it had to use because of the sinkhole rather than being able to reinvest that money within its own company.

The next prong of the test, whether the trial court accepted Texas Brine's prior position, is easily satisfied as evidenced by the trial court's prior judgment and reasons therefor. In dismissing Pontchartrain's capitalized interest claim, the court restated Texas Brine's argument that the type of capitalized interest Pontchartrain was attempting to recover was impermissible under Louisiana law. Specifically, the court noted that had Pontchartrain actually incurred and paid interest on funds borrowed for the express purpose of funding repairs, those funds would be recoverable, citing **Firmin**, 595 So.2d at 1171. However, because Pontchartrain's claim was for lost opportunity for the capital spent repairing the sinkhole damage rather than reinvesting within itself, that claim was not

27

recoverable. The trial court then noted the Louisiana Supreme Court's definition of prejudgment interest as being very similar to Pontchartrain's claim. The court stated that prejudgment interest is recoverable in tort cases. Thus, the court concluded that any award of prejudgment interest would make Pontchartrain whole for the loss of use of its capital incurred in its post-sinkhole repairs. Accordingly, Pontchartrain was not entitled to an additional award for its alleged lost use of funds, given that the capitalized interest it sought to recover did not represent expenditures resulting from the borrowing of capital for the specific purpose of funding Pontchartrain's repair projects resulting from the sinkhole.

The final prong of judicial estoppel is also satisfied as it appears unlikely that Texas Brine inadvertently argued the opposite of what it is arguing now. Rather, Texas Brine has been vigorously defending itself for over a decade in a multitude of capacities against a multitude of parties, and therefore, has found itself at times arguing conflicting legal theories depending on its adversary. Despite Texas Brine's best efforts, this court agrees with the trial court's ruling that Texas Brine's claim for capitalized interest should be dismissed with prejudice, finding Texas Brine is estopped from making such claims. Therefore, we affirm the trial court's July 19, 2022 judgment dismissing this claim with prejudice.

**MOTION TO STRIKE**

On March 21, 2022, Legacy Vulcan moved to strike Texas Brine's expert reports and supplemental discovery responses and exclude testimony relating to Texas Brine's claim for "lost opportunity" damages. Specifically, Legacy Vulcan sought to strike: 1) the expert reports of Bruce Martin, dated February 8, 2022, Robert W. Sneed, dated February 9, 2022, and Holly Sharp, dated February 17, 2022; 2) Texas Brine's March 14, 2022 third supplemental and amended responses and objections to Legacy Vulcan's supplemental damages-related interrogatories

and requests for production of documents and things, regarding allegations about Texas Brine's claims for the recovery of "lost opportunity" damage made the subject of the expert reports; and 3) all evidence by Texas Brine of its "lost opportunity" damage claims set forth and described in the expert reports and/or third supplemental and amended responses and objections to Legacy Vulcan's supplemental damages-related discovery requests. Fundamentally, Legacy Vulcan sought to exclude any evidence pertaining to a subset of Texas Brine's lost profits claim particularly regarding the sale of two of Texas Brine's properties, Baytown in 2013 and Napoleonville in 2015, to Texas Brine's affiliates.

Legacy Vulcan argued that this specific lost opportunity claim should be stricken as untimely, improper, prejudicial and unauthorized. Legacy Vulcan initially argued that because these claims constitute a request for special damages, which must be specifically plead under La. C.C.P. art. 861 and were not, the trial court should not allow them now, mere months prior to the Phase 2 trial. Legacy Vulcan explained that the unique structure of this litigation envisioned that all claims would be plead prior to the Phase 1 liability trial, or by the August 2016 case management order deadline, with only incidental matters, damages and insurance to be determined in later stages. Legacy Vulcan emphasized that while Texas Brine took full advantage of this time to amend its pleadings and added numerous claims sounding in tort and contract against Legacy Vulcan, it never mentioned the sale of these two properties as a claim.

Second, Legacy Vulcan argued that evidence of this claim should not be allowed because of Texas Brine's failure to timely supplement its discovery responses to identify this new "lost opportunity" damage claim, citing La. C.C.P. art. 1428; or to name the claim in any of its discovery responses that it submitted in 2016, 2018, 2019, or as recently as December 2021. Legacy Vulcan argued that although Texas Brine had asserted a claim for lost profits, that claim was

29

consistently described as being related to Texas Brine's inability to drill additional wells, namely the Oxy Taft 11 and 12 wells. Texas Brine never once alluded to any facts that it would claim the sale of two of its properties, Baytown and Napoleonville, to its own affiliates as potential claims under the lost profits category, even though the sales had occurred in 2013 and 2015 respectively. Legacy Vulcan concluded that because Texas Brine waited until the proverbial last minute to announce this claim, Legacy Vulcan would have no time prior to the Phase 2 trial to adequately prepare to defend this claim, and therefore, it should be stricken.

Legacy Vulcan's evidence introduced in support of this motion included the discovery requests propounded by Legacy Vulcan on Texas Brine once this claim was revealed, in an effort to demonstrate how much discovery and information would actually be necessary to prepare to litigate this claim.

Legacy Vulcan also entered into evidence, Texas Brine's May 27, 2016 amended answer and amended incidental demands which contained a section dedicated to "lost profits and lost opportunities." In this amended and incidental demand, Texas Brine pertinently averred as follows:

1.

Texas Brine has lost substantial business opportunities, both throughout Assumption Parish and the State of Louisiana, as a direct and proximate result of the acts and omissions of the other cross-defendants, third-party defendants, and defendants-in-reconvention.

2.

Prior to the appearance of the sinkhole, Texas Brine and Oxy Chem had entered into negotiations whereby it was contemplated that Texas Brine would drill two additional wells on the Napoleonville Salt Dome, to be identified as the Oxy Taft #11 and Oxy Taft #12 wells, and that these wells, once drilled would be operated by Texas Brine for Oxy Chem's benefit on a long-term basis...

30

3.

Texas Brine prepared and submitted permit applications on Oxy Chem's behalf in connection with the contemplated drilling of the proposed Taft #11 and Taft #12 brine wells, shortly before the Sinkhole appeared.

4.

In the aftermath of the Sinkhole, however, Texas Brine could not obtain regulatory authorization to proceed with any new drilling or brine mining projects on the Salt Dome, and thus, it was unable to proceed with the Taft #11 and Taft #12 project.

5.

Furthermore, due to the fault of other parties, which led to the appearance of the Sinkhole, Texas Brine was unable to realize other business opportunities and projects throughout the State.

6.

Since August 3, 2012, Texas Brine has not been approved for any new drilling or operational permits in the State of Louisiana.

7.

Prior to the sinkhole, Texas Brine had an established track record of drilling and operating new wells on a regular basis, and the decline in its business is attributable to the acts and omissions of the various cross-defendants, third-party defendants, and defendants-in-reconvention.

8.

Texas Brine is entitled to recover all lost profits attributable to its loss of business opportunities, revenue, and production based on projects to be located on the Salt Dome (including, but not limited to, the contemplated Oxy Taft #11 and Oxy Taft #12 Wells) and throughout the state of Louisiana.

Legacy Vulcan also introduced into evidence numerous discovery requests propounded on Texas Brine, as well as its answers, to demonstrate that Texas Brine had ample opportunity to reveal this particular claim, and never did. One such interrogatory propounded by Legacy Vulcan asked Texas Brine to provide at a minimum the following information: for all damages, the category and nature of the damages, the amounts of all such damages, the methodology or methodologies

31

used for determining such damages, for damages relating to lost revenue, lost production, lost profits and lost business opportunities. Legacy Vulcan further asked Texas Brine to identify what specific business opportunities it maintained that it lost or would lose. Then specifically, Legacy Vulcan asked, with respect to Texas Brine's lost opportunity claim, for Texas Brine to produce all documents relating to the "substantial business opportunities" it claimed to have lost as a result of the acts of any cross-defendants, third party defendants, and defendants-in-reconvention, including but not limited to, all permit applications, plans, contracts, negotiations, budgets, projections, forecasts, proposals, ledgers, meeting minutes, correspondence with regulatory agencies and/or potential customers or others who would be aware of and/or involved in these "substantial business opportunities." Texas Brine's response to these questions was that any expert reports and/or materials contemplated by these requests would be provided in compliance with the requirements of the Louisiana Code of Civil Procedure and the trial court's scheduling order.

Legacy Vulcan also introduced discovery from federal litigation involving the sinkhole, which also inquired as to Texas Brine's lost opportunity claim. Similarly, Texas Brine only referred to its inability to operate wells on the Salt Dome and transport brine through its pipelines as its lost business opportunity.

Texas Brine opposed this motion arguing that its expert reports were delivered timely according to the parties' case management order and Legacy Vulcan had not been prejudiced in receiving these timely-issued reports while having months to depose these witnesses in advance of trial. Texas Brine asserted this was just Legacy Vulcan's attempt to strike claims in a procedurally improper way. Texas Brine further argued that a clear reading of its various petitions throughout the years demonstrates that it has plead a lost opportunity claim for nearly the span of this litigation, which claim was never limited to only the drilling

32

of Oxy Taft 11 and 12; thereby notifying Legacy Vulcan that more claims could be made under the lost profit umbrella should they be discovered.

Texas Brine introduced the following as evidence during the hearing, in opposition to Legacy Vulcan's motion to strike: the deposition transcripts of Mr. Sneed, taken March 16 and 18, 2022, and Mr. Martin, taken March 23-25, which spanned 375 pages and 405 pages, respectively. Texas Brine used these to demonstrate that since the discovery of this claim, Legacy Vulcan has had ample opportunity to depose two of the three experts whose reports Texas Brine relied on to support its claim. Also used as evidence, the amended and restated case management order dated January 31, 2022, which set the supplemental discovery response cutoff date for April 19, 2022, and the expert report cutoff date for February 17, 2022, the date Texas Brine provided the expert reports in question to Legacy Vulcan. Texas Brine also introduced into evidence a copy of the email providing Legacy Vulcan with its expert reports, along with its discovery responses to demonstrate that Texas Brine was compliant with the court's case management dates.

Texas Brine also relied on the same amended answer and incidental demands as Legacy Vulcan, wherein Texas Brine asserted it was "entitled to recover all lost profits attributable to its loss of business opportunities, revenue, and production based on projects to be located on the Salt Dome (including, but not limited to, the contemplated [Taft 11] and [Taft 12] Wells) and throughout the state of Louisiana."

On April 5, 2022, this motion was heard. Following party arguments, the trial court noted that Legacy Vulcan had issued interrogatories to Texas Brine three times seeking to determine the scope of Texas Brine's lost profit claim, and in no way did Texas Brine even hint about this claim. Ultimately, the trial court took this motion under advisement.

On April 26, 2022, the trial court signed a judgment granting Legacy Vulcan's motion to strike the expert reports of Bruce Martin dated February 8, 2022, Robert W. Sneed dated February 9, 2022, and Holly Sharp dated February 17, 2022. The trial court also struck Texas Brine's March 14, 2022 third supplemental and amended responses and objections to Legacy Vulcan's supplemental damages-related interrogatories and requests for production of documents and things, as well as all testimony and evidence by Texas Brine of its "lost opportunity" damage claim set forth and described in the aforementioned expert reports and discovery responses. In its reasons for judgment, the trial court acknowledged that although the sale of these two properties by Texas Brine to its subsidiaries occurred in 2013 and 2015, prior to producing the expert reports in question, Texas Brine never mentioned that it was asserting this claim related to these properties. Although Texas Brine amended its claims many times during the course of litigation, it never articulated or expanded on any claim for "lost opportunity" damages, and also had not, prior to March 14, 2022, supplemented any of its discovery responses with any information regarding these sales. Ultimately, the trial court found that Texas Brine's dilatory attempt to formulate its new claim for millions of dollars with trial imminently drawing near must not be allowed, and Legacy Vulcan's motion to strike was granted.

Louisiana Code of Civil Procedure article 964 provides:

> The court on motion of a party or on its own motion may at any time and after a hearing order stricken from any pleading any insufficient demand or defense or any redundant, immaterial, impertinent, or scandalous matter.

Whether a motion to strike should be granted pursuant to Article 964 rests in the sound discretion of the trial court and is reviewed under the abuse of discretion standard. **Thurman v. Aguilar**, 2021-1514 (La. App. 1st Cir. 6/22/22), 343 So.3d 784, 791, writ denied, 2022-01110 (La. 11/1/22), 349 So.3d 7, citing, **Cole v. Cole,**

34

2018-0523 (La. App. 1st Cir. 9/21/18), 264 So.3d 537, 544. Motions to strike are disfavored and infrequently granted. This is because striking a portion of a pleading is a drastic remedy, and because motions to strike are often sought by the movant simply as a dilatory tactic. However, a motion to strike is proper if it can be shown that the allegations being challenged are so unrelated to a plaintiff's claims as to be unworthy of any consideration and that their presence in the pleading would be prejudicial to the moving party. A motion to strike is a means of clearing up the pleadings, not a means of eliminating causes of action or substantive allegations. **Id.**

Although styled as a "motion to strike," Legacy Vulcan's motion in actuality appears to be one for sanctions for violation of La. C.C.P. art. 1428.[8]

Louisiana Code of Civil Procedure article 1428 provides, in pertinent part:

> A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
>
> (1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to the identity and location of persons having knowledge of discoverable matters, and the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.
>
> (2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which he knows that the response was incorrect when made, or he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

The failure to timely supplement discovery responses, when a duty to do so exists, may trigger sanctions. Courts have regularly exercised their inherent powers by imposing sanctions for failing to timely supplement discovery responses. **Chapman v. Regional Transit Authority/TSMEL**, 95-2620 (La. App. 4th Cir. 10/2/96), 681 So.2d 1301, 1305. A trial court generally has great

---

[8] The technical name given to a motion is of little importance. See La. C.C.P. art. 962.

discretion to determine whether to admit testimony after a party objects on the ground that his opponent failed to fulfill the statutory mandate of La. C.C.P. art. 1428 to supplement discovery requests. **Jordan v. Intercontinental Bulktank Corp.**, 621 So.2d 1141, 1151-52 (La. App. 1st Cir.), writs denied, 623 So.2d 1335, 1336 (La. 1993), cert. denied, 510 U.S. 1094, 114 S.Ct. 926, 127 L.Ed.2d 219 (1994). While the trial judge has great discretion in deciding whether to receive or refuse the testimony objected to on the grounds of failure to abide by the statutory mandate, any doubt must be resolved in favor of receiving the testimony. **Maddox v. Bailey**, 2013-0564 (La. App. 1st Cir. 5/19/14), 146 So.3d 590, 595. When a party has not satisfied the technicality of supplementing discovery responses, the reviewing court can look to the record for a willful or negligent failure to disclose new information in determining whether the trial judge abused his discretion. **Id.**

Based on the evidence presented with regard to this motion, this particular claim arose, at the latest in 2015 with the sale of the Napoleonville property. Texas Brine asserted a lost profits claim generally, and specifically plead that it lost the opportunity to drill and operate two additional wells as a part of that claim. Throughout its pleading amendments as well as discovery exchanges, Texas Brine never identified the sale of these properties as a subset of its lost profits claim, and did not do so, until the respective discovery deadlines in the Phase 2 damages trial. Considering the history of this proceeding and the timeline established by the record evidence, we find no error in the trial court's implicit finding that a certain degree of willfulness was present on the part of Texas Brine, and its lack of supplementation of discovery and expert reports, which if allowed, would either result in further delay of this decade-long litigation, or hinder Legacy Vulcan's ability to defend itself against this claim. Therefore, we find no abuse of the trial court's discretion in its April 26, 2022 judgment, granting Legacy Vulcan's "motion to strike" all discovery and expert reports in support of Texas Brine's lost

profits claim strictly concerning the sale of its Baytown and Napoleonville properties.

We affirm the rulings on the motions challenging the recoverable amount of damages, and thus also affirm the parties' December 1, 2022 stipulated judgment insofar as the parties determined the total amount of damages to be allocated between the at-fault parties.

## ASSIGNMENT OF SALT LEASE

On March 4, 2022, Legacy Vulcan moved for partial summary judgment seeking to dismiss with prejudice Texas Brine's claims under the Assignment of Salt Lease. Within this motion, Legacy Vulcan alleged Texas Brine sought to exercise default remedies against it under Sections 6.01 and 6.02 of the Assignment of Salt Lease based on Legacy Vulcan's failure to "operate" on the Salt Lease premises in a prudent manner, and to conduct its operations in compliance with state and local regulations.[9] In so doing, Texas Brine sought to

---

[9] In its Exceptions, Answer, Affirmative Defenses, and Third-Party Demand filed August 2, 2013, Texas Brine averred the following third-party demand against Legacy Vulcan:

Count 5 – Breach of Contract – Vulcan

55.

Pursuant to the terms of the Assignment of Salt Lease, [Legacy] Vulcan assumed all obligations of the lessee in and under the Salt Lease and agreed to perform all covenants and agreements of the lessee contained in the Salt Lease.

56.

Section 6.01(d) of the Assignment of Salt Lease provides that [Legacy] Vulcan shall be in default if it fails to comply with its obligations under the Assignment of Salt Lease, including the obligation to perform all covenants and agreements of the lessee contained in the Salt Lease.

57.

Under Section 14 of the Salt Lease, [Legacy] Vulcan's obligations, as lessee, include the obligation to "operate" on the Oxy Land in a "prudent manner" and to conduct its operations in compliance with the regulations of all governmental agencies.

58.

[Legacy] Vulcan did not act as a reasonably prudent lessee in its extraction of salt from the Oxy Land because, at all relevant times, it was aware of the risks associated with brine production from the Oxy Land, including Well #3, and [Legacy] Vulcan did not instruct its operator, [Texas Brine], to revise its mining plan for any of the brine production wells, including Well #3, to address those risks.

37

recover from Legacy Vulcan damages, attorney's fees, and costs. However, Legacy Vulcan asserted that these duties belonged to Texas Brine, and therefore, Texas Brine had no recourse against Legacy Vulcan for Texas Brine's own breach.

Attached in support of the motion was the original Salt Lease, as well as the Amended and Restated Salt Lease, which delineated the rights and obligations between Texas Brine and Hooker Chemicals (Oxy's predecessor). Of note within the Amended and Restated Salt Lease, is Section 14 wherein Texas Brine agreed to operate on the leased premises in a prudent manner and to conduct its operations in compliance with the regulations of all governmental agencies.

Also attached as evidence was the Assignment of Salt Lease wherein Texas Brine, as owner of the aforementioned Salt Lease, assigned same to Legacy Vulcan. In the Assignment's preamble, the parties explained their relationship and mentioned other interrelated contracts into which they had already entered including an Operating Agreement, which provided that Legacy Vulcan had "engaged the services of Texas [Brine] to perform all or part of the duties and obligations of [Legacy] Vulcan under the Facilities Lease and the Salt Lease." The pertinent clauses within the Assignment are:

> 4.01 In consideration of the Assignment made herein, [Legacy] Vulcan hereby assumes all obligations of the Lessee in and under the Salt Lease effective as of this date and, in this connection, [Legacy] Vulcan agrees without limitation, as follows:
>
> (a) [Legacy] Vulcan shall pay all royalty, minimum royalty and all other payments, contingent or otherwise, required to be made by the Lessee under the Salt Lease...
>
> (b) [Legacy] Vulcan or its operators shall perform all covenants and agreements of the Lessee in the Salt Lease on or before the dates such performance is required by the Salt Lease...

---

As such, [Legacy] Vulcan is in default of the Assignment of Salt Lease, and [Texas Brine] is entitled to recover damages for [Legacy] Vulcan's breach, including all legal fees and other costs and expenses pursuant to Sections 6.01(d) and 6.02 of the Assignment of Salt Lease.

(c) [Legacy] Vulcan shall perpetuate the Salt Lease in force and effect for the term thereof and shall permit no default on the part of the Lessee in the Salt Lease subject to the Special Termination Right set forth under Section 4 of the Salt Lease.

***

6.01 The following events will constitute defaults ("Defaults") under this Assignment:

(a) [Legacy] Vulcan shall fail to make any payment of any royalty, minimum royalty or any other sum required of the Lessee under the Salt Lease and/or comply with any covenant or agreement of the Lessee as provided in the Salt Lease.

(b) [Legacy] Vulcan shall fail to make any payment of any Basic Rent or improperly fail to pay any Supplemental Rent or other sum required of [Legacy] Vulcan in the Facilities Lease and/or comply with any covenant or agreement of [Legacy] Vulcan, as the lessee, in the Facilities Lease.

(c) [Legacy] Vulcan shall fail to make any payment provided for in the Agreement Relative to Financing in favor of the Leasehold Mortgagee.

(d) [Legacy] Vulcan shall fail to comply with its obligations under this Assignment.

(e) [Legacy] Vulcan shall become insolvent or bankrupt or make any assignment for the benefit of creditors or consent to the appointment of a trustee or receiver for a substantial part of its property...

6.02 Upon the occurrence of any Default, and at any time thereafter so long as the same shall be continuing, Texas [Brine] may, at its option, by notice to [Legacy] Vulcan, declare this Assignment to be in default. So long as [Legacy] Vulcan shall not have remedied all outstanding Defaults, it is agreed, as between Texas [Brine] and [Legacy] Vulcan, that Texas [Brine] may do, and [Legacy] Vulcan shall comply with, one or more of the following, as Texas [Brine] shall in its sole discretion elect, to the extent permitted by, and subject to compliance with, any mandatory requirements of applicable law in effect: (i) Texas [Brine] may terminate this Assignment upon the date specified in a written termination notice to [Legacy] Vulcan; or (ii) Texas [Brine] may cure or endeavor to cure such Default, whereupon [Legacy] Vulcan shall reimburse Texas [Brine] all sums paid by Texas [Brine] for the account of [Legacy] Vulcan and the reasonable cost and expense actually incurred by Texas [Brine] in curing or endeavoring to cure such Default together with interest thereon at the rate of 10.75% per annum; (iii) Texas [Brine] may exercise any other right or remedy which may be available to Texas [Brine] under applicable law or proceed by appropriate court action to enforce the terms hereof or to recover damages for the breach hereof.

39

Except as otherwise provided above, [Legacy] Vulcan shall be liable for all legal fees and other costs and expenses incurred by Texas [Brine] by reason of the exercise of [Texas Brine's] remedies with respect thereto. No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Texas [Brine] at law or in equity...

Legacy Vulcan also attached as evidence, Texas Brine's third-party demand, wherein Texas Brine averred the parties' roles generally as: Legacy Vulcan owned the Geismar Plant and was obligated to pay royalties to Oxy for the salt extracted from the Salt Lease property, during which time, Texas Brine served as Legacy Vulcan's operator in producing and supplying brine to the Geismar Plant under the Operating Agreement. More specifically, Texas Brine averred the OG3 was drilled and owned by Legacy Vulcan and operated by Texas Brine pursuant to the Operating Agreement.

Legacy Vulcan also attached as evidence the deposition excerpts of Bruce Martin where he attested that until Legacy Vulcan's sale to Oxy in 2005, he was unaware of Legacy Vulcan defaulting on the Assignment of Salt Lease. Also attached was the Amended and Restated Operating Agreement, which provides in pertinent part:

WHEREAS, Texas [Brine] and [Legacy] Vulcan also entered into an Operating and Supply Agreement...dated as of October 29, 1975, pursuant to which Texas [Brine] operates the facilities leased to [Legacy] Vulcan pursuant to the Original Facilities Lease, as well as facilities owned by [Legacy] Vulcan and acquired after the commencement date of the Original Operating Agreement by reason of the replacement, modification, and expansion thereof, for and on behalf of [Legacy] Vulcan, for the purpose of producing and delivering salt brine to [Legacy] Vulcan's plant at Geismar, Louisiana; and

WHEREAS, pursuant to that certain Assignment of Salt Lease between Texas [Brine] and [Legacy] Vulcan dated as of October 27, 1976, Texas [Brine] assigned all of its right, title and interest as lessee in and under the Salt Lease to [Legacy] Vulcan, and [Legacy] Vulcan assumed all obligations of Texas [Brine] as lessee in and under the Salt Lease; and

\*\*\*

40

**"Facilities"** means all improvements and property, whether real immovable or personal movable, constructed or used, or obtained by Texas [Brine] or [Legacy] Vulcan for construction or use, in connection with or incidental to the production and extraction of Salt and Brine from the Salt Lease Premises and the transportation and delivery thereof to the Delivery Point at [Legacy] Vulcan's Plant...

\*\*\*

Section 2.2 <u>Operation of Premises</u>. Texas [Brine] shall operate for the account of [Legacy] Vulcan all of the Leased Premises, as well as facilities owned by [Legacy] Vulcan by reason of replacement, modification and expansion, for and during the full term of said Lease, and shall produce and deliver for the account of [Legacy] Vulcan from such facilities to [Legacy] Vulcan at Geismar, Louisiana, Salt in the form of Brine in accordance with the terms of this Agreement.

Section 2.3 <u>Maintenance</u>. Texas [Brine] shall (a) keep the Facilities and other Leased Premises in as reasonably safe condition as its operations permit, (b) keep the Facilities and other improvements and Lease Premises located on the Salt Lease Premises, whether leased to [Legacy] Vulcan or owned by it, and all other property leased to [Legacy] Vulcan under the Lease...in good repair and operating condition...making from time to time all necessary and proper repairs thereto...and (c) comply with, perform, and fulfill all obligations of [Legacy] Vulcan to Texas [Brine] under the Lease with respect to the maintenance, operation, and preservation of the Leased Premises.

\*\*\*

Section 12.6 <u>Compliance with Law: Use of Hazardous Materials</u>. In the performance of its obligations under this Agreement, Texas [Brine] shall comply in all material respects with all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state[,] county and municipal authorities pertaining to its operation of the Facilities and the other Leased Premises, and with the recorded covenants, conditions and restrictions, regardless of when they become effective...and all applicable Environmental Laws.

Texas Brine opposed the motion, asserting numerous arguments including: that Legacy Vulcan did not assign all of the lessee's obligations under the Salt Lease to Texas Brine, and that the Amended Operating Agreement charged Texas Brine with Legacy Vulcan's obligations only with respect to the Facilities Lease rather than the Salt Lease. Texas Brine continued to argue that Legacy Vulcan's duties to act as a prudent lessee are distinct from Texas Brine's duties as the brine well operator, and although Texas Brine was obligated to perform certain operational duties, it never re-assumed lessee duties under the Salt Lease. Further,

Texas Brine argued that because Legacy Vulcan had already been found to have breached its duties as a mineral lessee, it was clearly in default of the Assignment of Salt Lease.

Following the hearing on Legacy Vulcan's motion for partial summary judgment, the trial court took the matter under advisement and signed a judgment on May 5, 2022, granting Legacy Vulcan's motion for partial summary judgment dismissing with prejudice Texas Brine's claim under the Assignment of Salt Lease.

Texas Brine now appeals, contending that the trial court erred in ignoring this court's repeated findings in the Phase 1 liability trial that Legacy Vulcan breached its duty as a prudent lessee of the Salt Lease. Texas Brine asserts those breaches are defaults by Legacy Vulcan under the Assignment of Salt Lease. Texas Brine further argues that the trial court erred in confusing Texas Brine's operational obligations under the Amended Operating Agreement with Legacy Vulcan's duties as the lessee under the Salt Lease. Finally, Texas Brine argues that genuine issues of material fact exist as to the scope of the obligations assigned to Legacy Vulcan by Texas Brine in the Assignment of Salt Lease and Texas Brine's corresponding contractual duties.

Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. Courts are bound to give legal effect to all contracts according to the true intent of the parties. **Belle Pass Terminal, Inc. v. Jolin, Inc.,** 92-1544 (La. App. 1st Cir. 3/11/94), 634 So.2d 466, 479, writ denied, 94-0906 (La. 6/17/94), 638 So.2d 1094. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. In instances where the mutual intention of the parties has not been fairly explicit, the court may consider all pertinent facts and circumstances, including the party's own conclusions rather than adhere to a

forced meaning of the terms used in the contract.  **Belle Pass Terminal, Inc.**, 634 So.2d at 479-480.

The words of a contract must be given their generally prevailing meaning. La. C.C. art. 2047.  Intent is to be determined in accordance with the plain, ordinary, and popular sense of the language used and by construing the entirety of the document on a practical, reasonable, and fair basis.  **Belle Pass Terminal, Inc.**, 634 So.2d at 480.  Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract.  La. C.C. art. 2048.  Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050.  A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053.

Louisiana Revised Statutes 31:122 provides a mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor.  <u>Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.</u> (Emphasis added).

The Salt Lease, which originated all of the parties' rights and obligations provides the Lessee with two main obligations, to pay royalties and to operate on the premises in a prudent manner, which includes running periodic tests on the premises, and abiding by state and local regulations.  Using this Lease as a base, Texas Brine and Legacy Vulcan began to craft their respective duties through a series of contracts including the Operating Agreement, whereby Texas Brine obligated itself to operate on the property in a prudent manner, abide by

43

government regulations and run periodic testing and Legacy Vulcan agreed to compensate Texas Brine. With this delegation of obligations in place, the parties entered into the Assignment of Salt Lease, wherein the parties acknowledged these established stipulations when Legacy Vulcan took on all of the obligations of the Lessee of the Salt Lease, including the obligation to pay royalties to Oxy, but noting that any actual operation would be done by either it or its operator (Texas Brine). In this context, we agree with Texas Brine that Legacy Vulcan did not "assign back" all of its Lessee obligations to Texas Brine, because Legacy Vulcan maintained the obligation to pay. However, any operational obligations were clearly given to and accepted by Texas Brine.

This court acknowledges that in the Phase 1 liability opinion, Legacy Vulcan was found to have breached its duty as a prudent lessee. However, the purpose of Phase 1 was to determine what caused the sinkhole to form and which parties were at fault under any theory of law for causing the formation of the sinkhole. **Pontchartrain Natural Gas System**, 317 So.3d at 725. (Emphasis added.) This court noted that by statute, Legacy Vulcan had a general duty to act as a prudent lessee, which duty it breached. However, contrary to Texas Brine's argument, there was no finding that Legacy Vulcan breached a particular obligation found in the Salt Lease, or Assignment thereof. **Pontchartrain Natural Gas System**, 317 So.3d at 755-57. Instead, it was Texas Brine that was found to be in breach of its actual contractual obligations for not prudently operating the OG3. **Id**. at 758-59.

For the foregoing reasons, we affirm the trial court's May 5, 2022 judgment granting Legacy Vulcan's motion to dismiss with prejudice Texas Brine's claims under the Assignment of Salt Lease.

## INTENTIONAL TORT

On May 19, 2022, Texas Brine moved for partial summary judgment regarding Legacy Vulcan's liability as an "intentional tortfeasor" for Texas Brine's

damages. Within this motion, Texas Brine requested that Legacy Vulcan be found 100% liable for the damages resulting from the sinkhole in accordance with La. C.C. art. 2323(C), since Legacy Vulcan was found to be an intentional tortfeasor. Texas Brine emphasized this court's finding that Legacy Vulcan "intentionally omitted" crucial information at the time of the sale of its chloralkali business to Oxy, to demonstrate that Legacy Vulcan had been adjudicated an intentional tortfeasor. **Pontchartrain Natural Gas System**, 317 So.3d at 756-57. Thus, Texas Brine concluded Legacy Vulcan, an intentional tortfeasor, could not benefit from comparative fault by reducing its liability for damages owed to Texas Brine, a mere negligent party. Alternatively, Texas Brine argued that if Legacy Vulcan should not be found 100% at fault, then Legacy Vulcan should at least be 70% at fault, 15% for its own fault, and 55% for Texas Brine and its affiliate.

Attached in support of this motion were transcript excerpts from the Phase 1 trial regarding the circumstances around the 2004-2005 sale of Legacy Vulcan's chloralkali business to Oxy. In connection with the sale, Legacy Vulcan requested Texas Brine to produce a summary regarding salt reserves remaining in the Salt Lease Premises, which Texas Brine provided, while also noting that there were concerns with the OG3's proximity to the edge of salt. Texas Brine explained the proximity was concerning because there was a real risk of losing the well prematurely, due to washing out of the formation. The email evidencing this exchange was also attached in support of this motion, as was the email from Legacy Vulcan to Oxy which reflected the salt reserve numbers provided by Texas Brine, but failed to include any information about the proximity of the OG3 to the salt dome edge and/or risk of a washout.

Legacy Vulcan opposed this motion, arguing that its negligence was affirmed by the First Circuit with its allocation of 15% comparative fault to Legacy Vulcan. Legacy Vulcan further argued that any intentional acts mentioned in the

Phase 1 opinion were strictly between Legacy Vulcan and Oxy, and were discussed in order to resolve Legacy Vulcan's subsequent purchaser doctrine argument on appeal.

Legacy Vulcan supported its opposition, in pertinent part, with this court's Phase 1 liability opinion, as well as Texas Brine's application for writs to the Louisiana Supreme Court, wherein it argued Legacy Vulcan should be 100% at fault because its intentional acts caused the sinkhole.

A hearing on this motion was held on June 21, 2022. Following party arguments, the trial court denied the motion, concluding although there had been a finding of an intentional act by this court, there was no finding of an intentional tort. A judgment reflecting this ruling was signed by the trial court on July 19, 2022.

Texas Brine initially sought this court's review via supervisory writ, which was referred to an appeal panel deciding issues of fraud; however, this court found the matter not sufficiently connected to the limited appeal. See **Pontchartrain Natural Gas System v. Texas Brine Company, LLC**, 2022-0594/2022-0961 (La. App. 1st Cir. 1/20/23), 361 So.3d 491, 497 n.1, writ denied, 2023-00255 (La. 6/7/23), 361 So.3d 983.

In the present appeal, Texas Brine argues the trial court erred in its application of comparative fault principles, ignoring article 2323(C), despite this court's findings that Legacy Vulcan's tortious acts were intentional. Texas Brine emphasized that this court "repeatedly found that [Legacy] Vulcan acted 'intentionally' in causing the sinkhole," citing, **Pontchartrain Natural Gas System**, 317 So.3d at 756, 757, 760-61.

Louisiana Civil Code article 2323 provides in pertinent part:

A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined,

46

regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of [La.] R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

***

C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.

After reviewing the evidence presented as well as this court's Phase 1 liability opinion, we affirm the trial court's ruling. In the Phase 1 liability appeal, Legacy Vulcan assigned as error, any imposition of liability upon it by the trial court, due to Legacy Vulcan's status as a former owner of property when the sinkhole occurred. **Pontchartrain Natural Gas System**, 317 So.3d at 739. With regard to this assignment, this court explained:

> As between Legacy Vulcan and Oxy, we find Legacy Vulcan owed a duty to disclose the risks associated with the caverns on the North 40 upon the sale of Legacy Vulcan's chloralkali business which included the Salt Lease to Oxy. If the former owner, prior to the sale of property, knows of a defective condition and conceals the problem, rather than repairing or at least advising of the condition, it may be responsible for plaintiff's injuries. The subsequent sale of the property, as a matter of law, does not automatically absolve the former owner of its negligent acts. At the very least, the former owner has a duty to advise or make the new owner aware of conditions that could pose a danger to others. Thus, despite Legacy Vulcan's arguments to the contrary, where a defective thing is involved, not only can its owner be responsible for damages, but also the party who actually created the risk whether or not he is the owner. [Internal citations omitted.]

**Pontchartrain Natural Gas System**, 317 So.3d at 754-55.

Following this recital of law, this court highlighted Legacy Vulcan's actions during the sale of its chloralkali business to Oxy, noting that it intentionally omitted a portion of Texas Brine's report that stated the OG3 was near the salt

47

dome edge. **Id.** at 756. This court once again noted that Legacy Vulcan failed to warn Oxy of the OG3's closeness to the edge of the salt dome by "intentionally omit[ting] the portion of the 2004 email that specifically stated that the OG3 posed the biggest concern on the North 40, as the data...suggested that the OG3 was very close to the edge of salt and at real risk of being lost prematurely." **Id.** at 757. Finally, in discussing fault allocations, this court found that the trial court was not erroneous in finding that Legacy Vulcan breached its duty to disclose information during its sale of its chloralkali business, by intentionally withholding the information regarding the OG3's potential breakthrough, and affirmed the 15% fault assigned by the trial court. **Id.** at 760.

Thus, this court found that Legacy Vulcan was aware of a potential defect in the property it was selling to Oxy, and not only failed to disclose the defect but concealed it from Oxy, which in turn took away Legacy Vulcan's subsequent purchaser "shield." The court further found that Oxy was a sophisticated party with other wells in the area, but that did not relieve Legacy Vulcan from the consequences of its own negligent actions. **Pontchartrain Natural Gas System,** 317 So.3d at 757, 760-61.

In the tort context, an "intentional act" requires the actor to either (1) consciously desire the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) know that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result. See **Matthews v. Turner Industries Group, L.L.P.,** 2020-00493 (La. 6/22/20), 297 So.3d 723. The Phase 1 liability trial did not find Legacy Vulcan desired for the sinkhole to occur, and there was no evidence presented that anyone was aware, in 2004-2005 when the sale occurred, that a sinkhole would emerge. Texas Brine's own witness testimony explained that the contemplated "wash out" would result in premature closure of the well/cavern for mining, not a sinkhole. **Pontchartrain**

**Natural Gas System**, 317 So.3d at 731 ("Mr. Grabowski explained at trial that the risk posed by the OG3's proximity to the edge of the dome was not a sinkhole.") Thus, although Legacy Vulcan actively concealed issues with the OG3, this did not rise to the level of an intentional tort. Therefore, we affirm the trial court's July 19, 2022, judgment denying Texas Brine's motion for partial summary judgment regarding Legacy Vulcan's liability as an intentional tortfeasor for Texas Brine's damages.

## AMENDED OPERATING AGREEMENT

On November 17, 2021, Legacy Vulcan moved for partial summary judgment seeking to dismiss with prejudice Texas Brine's claims under the Amended Operating Agreement. Within this motion, Legacy Vulcan argued in the alternative. First, Legacy Vulcan argued that Texas Brine could not prove Legacy Vulcan breached the Amended Operating Agreement while the contract was in effect. Legacy Vulcan asserted that under the Amended Operating Agreement, it was only obligated to make timely payments to Texas Brine. Citing to the trial court's prior ruling finding that the Amended Operating Agreement was cross-extinguished in March 2008 due to confusion, Legacy Vulcan argued that no breach of any obligation to pay had occurred up to that point.[10] Because all of Texas Brine's contract claims with regards to the Amended Operating Agreement arose after the emergence of the sinkhole in 2012, Texas Brine had no valid

---

[10] The issue of confusion was previously determined by this court in **Pontchartrain Natural Gas System, k/d/s Promix, L.L.C., and Acadian Gas Pipeline System v. Texas Brine Company, LLC**, 2022-0446 (La. App. 1st Cir. 10/24/22), 354 So.3d 48, writs denied, 2022-01724, 2022-01706 (La. 2/7/23), 354 So.3d 674,676, citing, **Florida Gas Transmission Company, LLC v. Texas Brine Company, LLC**, 2022-0004 (La. App. 1st Cir. 8/3/22), 348 So.3d 93, writ denied, 2022-01344 (La. 12/20/22), 352 So.3d 85. In these appeals, this court found that although the obligations found within the Salt Lease were extinguished as a result of confusion on March 27, 2008, and that the Amended Operating Agreement and Amended Facilities Lease along with the Assignment of Salt Lease were cross-extinguished on that same date, any actionable obligation between Texas Brine and Legacy Vulcan could still be enforced even after extinguishment because neither of these parties were the cause of the extinguishment. See **Florida Gas Transmission Company, LLC**, 348 So.3d at 105.

reimbursement or indemnity claims under the contract, as both arose well after the extinguishment of the contract.

Alternatively, Legacy Vulcan argued that because Texas Brine breached the agreement by failing to act as a prudent operator, citing **Pontchartrain Natural Gas System**, 317 So.3d at 758-59, Texas Brine was barred from demanding performance from Legacy Vulcan under the Amended Operating Agreement in accordance with La. C.C. art. 1993.

In support of its motion, Legacy Vulcan attached as evidence, the Amended Operating Agreement which contains the following indemnification clause:

> Section 12.3 <u>Indemnification</u>. … Texas [Brine] and [Legacy] Vulcan shall each pay one-half of all losses and all claims, demands, payments, suits, actions, recoveries, and judgments, … of every nature and description, brought, recovered or arising out of the joint and concurring negligence of the parties…

Texas Brine opposed the motion asserting numerous arguments including: that the trial court had already found that confusion did not terminate Legacy Vulcan's obligations created in the Amended Operating Agreement; that Legacy Vulcan has already been found to have breached the Amended Operating Agreement by its negligence in thinning the walls of the salt cavern, citing **Pontchartrain Natural Gas System**, 317 So.3d at 756-57; that Legacy Vulcan breached its duty to perform its contractual obligations in good faith; that there are no reciprocal obligations that were breached in the Amended Operating Agreement, thereby rendering La. C.C. art. 1993 inapplicable; and that the indemnification clause found within the Amended Operating Agreement was an independent clause that could survive despite any breach of this contract.

On December 16, 2021, Legacy Vulcan's motion for partial summary judgment dismissing Texas Brine's claim under the Amended Operating Agreement came for hearing. Following party arguments, the court took the matter under advisement. On January 18, 2022, the trial court executed a judgment

granting Legacy Vulcan's motion for partial summary judgment and dismissing with prejudice, Texas Brine's claims against Legacy Vulcan under the Amended Operating Agreement.

On appeal, Texas Brine has narrowed its argument regarding its Amended Operating Agreement claims, focusing on the application of the indemnity clause. Texas Brine asserts that the trial court erred in essentially rewriting the Amended Operating Agreement by disregarding the parties' contractual indemnity provision that allocated tort liability in the event of joint negligence. Moreover, Texas Brine argues that the trial court misinterpreted La. C.C. art. 1993 and its applicability to a contractual indemnity clause.

In opposition, Legacy Vulcan argues that Texas Brine's interpretation of the indemnity clause is incorrect, asserting that Section 12.3 governs indemnity for claims prosecuted against Texas Brine and Legacy Vulcan based on their joint and concurring negligence, not Texas Brine's breach of contract. Legacy Vulcan further argues, there is nothing in the Amended Operating Agreement which renders Legacy Vulcan, the customer to whom the operational obligations were owed, liable to Texas Brine for its breach of those obligations. Instead, Texas Brine, as the obligor and breaching party is liable for the damages caused by its failure to perform a conventional obligation.

The general rules governing the interpretation of contracts apply in construing a contract of indemnity. **Dean v. Griffin Crane & Steel, Inc.**, 2005-1226 (La. App. 1st Cir. 5/5/06), 935 So.2d 186, 191, <u>writ denied</u>, 2006-1334 (La. 9/22/06) 937 So.2d 387. A contract of indemnity forms the law between the parties and therefore must be interpreted according to its own terms and conditions. The purpose of an indemnity agreement is to allocate the risk inherent in the activity between the parties to the contract. **Liem v. Austin Power, Inc.**, 569 So.2d 601, 608 (La. App. 2nd Cir. 1990). The question to be considered in

determining whether an indemnity agreement is enforceable is "whether the risk that resulted in the injury was one contemplated by the parties to the contract." **Perkins v. Rubicon, Inc.**, 563 So.2d 258, 259 (La. 1990).

Moreover, a contract of indemnity whereby the indemnitee is indemnified against the consequences of his own negligence is strictly construed, and such a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent acts unless such an intention is expressed in unequivocal terms. **Berry v. Orleans Parish School Board**, 2001-3283 (La. 6/21/02), 830 So.2d 283, 285, <u>citing</u> **Perkins**, 563 So.2d at 259. A clear reading of the indemnity clause contained in the Amended Operating Agreement does provide for indemnification for claims arising out of the parties' joint and concurring negligence. Black's law dictionary defines "concurrent negligence" as, "the negligence of two or more parties acting independently but causing the same damage;" and "joint negligence" as "the negligence of two or more persons acting together to cause an accident." Black's Law Dictionary 12th Edition (2024).

After reviewing the Amended Operating Agreement and considering other summary judgment evidence, we find Legacy Vulcan failed to satisfy its summary judgment burden of proof. La. C.C.P. art. 966(D)(1). Contrary to Legacy Vulcan's arguments, whether Texas Brine or Legacy Vulcan breached their respective contractual obligations is not pertinent to the consideration of whether the indemnity clause found in Section 12.3 applies. By its clear terms, the obligations set forth in the indemnity provision are triggered by the parties' negligence. The indemnity provision does not prohibit its application in favor of or enforcement by a breaching party. Therefore, La. C.C. art. 1993, concerning default and performance of reciprocal obligations, does not bar enforcement of the parties' indemnity obligations. Finding Legacy Vulcan failed to show it is entitled to summary judgment as a matter of law, we reverse the January 18, 2022

52

judgment granting Legacy Vulcan's motion for partial summary judgment to dismiss all claims asserted by Texas Brine under the Amended Operating Agreement.

**DECREE**

For the reasons set forth in this opinion, we reverse the January 18, 2022, judgment granting Legacy Vulcan, LLC's motion for partial summary judgment and dismissing with prejudice Texas Brine Company, LLC's claims under the Amended Operating Agreement.

Accordingly, we further vacate the portion of the December 1, 2022 judgment ordering Legacy Vulcan, LLC to reimburse Texas Brine Company in the amount of $11,896,554.80, and remand to the trial court for further proceedings in accordance with this ruling.

We affirm the remaining judgments of the trial court: the January 18, 2022 judgment dismissing with prejudice Texas Brine Company, LLC's claims for double recovery of insured losses and liabilities; the July 19, 2022 judgment dismissing with prejudice Texas Brine Company, LLC's claims against Legacy Vulcan, LLC for alleged costs associated with vendors, Commerce Title & Abstract Company and Right of Way Services, Inc., to recover closing costs and appraisal costs associated with Texas Brine Company, LLC's voluntary acquisition of properties; the July 19, 2022 judgment dismissing with prejudice Texas Brine Company, LLC's claim against Legacy Vulcan, LLC for capitalized interest; the April 26, 2022 judgment granting Legacy Vulcan, LLC's motion to strike all discovery and expert reports related to Texas Brine Company, LLC's specific lost opportunity claim regarding the sale of its Baytown and Napoleonville properties; the May 5, 2022 judgment dismissing with prejudice Texas Brine Company, LLC's claim under the Assignment of the Salt Lease; the July 19, 2022 judgment denying Texas Brine Company, LLC's motion for partial summary judgment

regarding Legacy Vulcan, LLC's liability as an intentional tortfeasor; and the December 1, 2022 stipulated judgment insofar as the parties determined a total amount of damages that were to be allocated between the at-fault parties.

All costs of this appeal are assessed equally between the parties: one-half to the appellant, Texas Brine Company, LLC and one-half to the appellee, Legacy Vulcan, LLC.

**JANUARY 18, 2022 PARTIAL SUMMARY JUDGMENT IN FAVOR OF LEGACY VULCAN, LLC REVERSED; DECEMBER 1, 2022 JUDGMENT IN FAVOR OF TEXAS BRINE COMPANY AND AGAINST LEGACY VULCAN, LLC IN THE AMOUNT OF $11,896,554.80 VACATED AND REMANDED; ALL OTHER JUDGMENTS ON APPEAL AFFIRMED.**